871 P.2d 380

Sydney Morris DOUGHTY,
Plaintiff–Appellee,

v.

William W. MORRIS, Defendant–
Appellant.

No. 13256.

Court of Appeals of New Mexico.

Feb. 2, 1994.

Charles E. Hawthorne, Hawthorne & Hawthorne, P.A., Ruidoso, for plaintiff-appellee.

Mel B. O'Reilly, Law Offices of Mel B. O'Reilly, Albuquerque, for defendant-appellant.

## OPINION

CHAVEZ, Judge.

This case involves a suit by a sister (Sydney) against her brother (Bill) for tortious interference with an expected inheritance from their mother (Emily). At issue are Emily's inter vivos transfers of most of her property to Bill shortly before her death so that no property remained in her estate to divide equally between Bill and Sydney, as specified in her Will. Bill challenges whether there was substantial evidence to support the trial court's judgment. We hold that a claim for intentional interference with an inheritance is actionable in New Mexico and affirm the trial court's award to Sydney in part and reverse in part.

## FACTS

Bill and Sydney are Emily's only children. At trial, Emily was characterized as someone who very much cared for her children. Although Emily was hindered with poor health during the last year of her life, neither party challenges her competency during her lifetime. In fact, almost until her death, Emily conducted her own business affairs, hired her own employees, balanced her own checkbooks, and was very alert. As of February 1989, Emily owned her house and its contents, three certificates of deposit in the amount of $10,000 each with Bill as joint tenant, three certificates of deposit in the amount of $10,000 each with Sydney as joint tenant, a savings account in the amount of $18,000 with Bill as joint tenant, a savings account in the amount of $19,000 with Sydney as joint tenant, and approximately $240,000 worth of Chevron stock. Emily's Will devised her estate equally between Bill and Sydney.

In February 1989 Emily became severely ill. When Sydney arrived to see Emily, Bill told Sydney that Emily wanted them to share the house in Ruidoso after her death. Sydney did not want to share the house with Bill and told him that he could have the house if he would pay her for one-half of its value. When Sydney returned to Albuquerque, Bill told Emily that Sydney refused to share the house with him. Bill testified that this news upset Emily. In May of 1989, Emily transferred title to her home and all of the furniture to Bill.

In June of 1989, Sydney returned to Ruidoso to visit Emily. Sydney told Emily that it would be more convenient to make Bill the personal representative of the Will since Bill lived with Emily. Emily agreed and a codicil to the Will was prepared and executed by Emily. Despite the change of personal representative, the Will remained the same and called for Emily's estate to be divided equally between Sydney and Bill. On the last day of Sydney's visit, Emily told Sydney that she had conveyed the house and furniture to Bill. Emily did not provide an explanation for the conveyance and Bill never mentioned the matter to Sydney.

During Sydney's visit to Emily the following month, Emily asked Sydney to change ownership of the Chevron stock from herself to Sydney and Bill. Despite the change of ownership, Emily informed them that she wanted to continue to receive the dividends during the term of her life. Upon discussing this transfer with a Chevron representative, Sydney's husband was informed that under this arrangement Sydney and Bill would be liable for the income taxes on the dividends. Sydney called Bill and told him that she did not want to be liable for the income taxes on

her share of the stock and suggested that the income tax liability be paid from the dividends. Bill conveyed Sydney's suggestion to Emily, which according to Bill, upset Emily. Neither Bill nor Emily mentioned Emily's anger to Sydney.

On September 8, 1989, Emily called Sydney in a panicked state, because Bill had told her that, "he just could not cope any longer, that he needed to be alone, and that he was moving out of her house." Emily became so distraught about Bill's statement that she entered the hospital that same day.

Five days later Bill spoke with an employee and the president of the Bank of Ruidoso about transferring the three certificates of deposit and the savings account, which were in the name of Emily and Sydney as joint tenants, to Emily and himself. At Bill's request, the Bank of Ruidoso prepared a letter to be signed by Emily authorizing the transfer of the certificates of deposit and savings account to Bill. Bill took this letter to the hospital. The next day a hospital employee, outside Bill's presence, went to Emily to notarize the letter. The hospital employee testified that it took forty-five minutes for Emily to sign the letter, because the letter had to be read aloud to Emily who repeatedly told the hospital employee, "I don't know why I have to sign this." Eventually, Emily signed the letter. The certificates of deposit and the savings account were transferred to Bill and Emily that same day.

Emily died approximately one month later. After Emily's death, Sydney tried to contact Bill to discuss their mother's estate, however, Bill never returned her calls. On Thanksgiving Day of 1989, Sydney called a close friend of Bill's and informed her that she was going to come to Ruidoso the next day. The next morning Bill called Sydney and told her not to come to Ruidoso because he owned everything in their mother's estate and the property Sydney received from Emily's estate depended on how well she treated him.

## STANDARD OF REVIEW

■ This Court does not reweigh the evidence on appeal and is "bound by the trial court's findings of fact unless they are demonstrated to be clearly erroneous or not sup-

ported by substantial evidence." *Roybal v. Morris,* 100 N.M. 305, 311, 669 P.2d 1100, 1106 (Ct.App.1983). The duty to weigh the credibility of witnesses and to resolve conflicts in the evidence lies with the trial court, not the appellate court. *Williams v. Williams,* 109 N.M. 92, 95, 781 P.2d 1170, 1173 (Ct.App.), *cert. denied,* 109 N.M. 54, 781 P.2d 782 (1989). We consider the evidence in the light most favorable to the prevailing party and disregard any inferences and evidence to the contrary. *Montoya v. Torres,* 113 N.M. 105, 109, 823 P.2d 905, 909 (1991). Furthermore, findings of the trial court should receive a construction which will uphold, rather than defeat, the judgment below. *Roybal,* 100 N.M. at 311, 669 P.2d at 1106.

## DISCUSSION

■ New Mexico has not recognized a cause of action for tortious interference with a prospective inheritance. Despite this fact, Sydney plead in her complaint the elements necessary to sustain this cause of action. The trial court took evidence regarding Sydney's claim and eventually ruled in her favor. Additionally, the trial court adopted Sydney's proposed conclusion of law which stated that New Mexico recognized this cause of action. Although the trial court erred in this regard, we see no reason for not recognizing this new tort. Today, we extend the line of New Mexico cases acknowledging tortious interference causes of action to include a cause of action against those who intentionally and tortiously interfere with an expected inheritance.

In a different but in a related context, New Mexico has upheld claims of tortious interference with an existing contract, *Wolf v. Perry,* 65 N.M. 457, 339 P.2d 679 (1959), and with prospective contractual relations, *M & M Rental Tools, Inc., v. Milchem, Inc.,* 94 N.M. 449, 612 P.2d 241 (Ct.App.1980). The Restatement (Second) of Torts 774B (1979) embraces the cause of action for tortious interference with an inheritance and states, "[o]ne who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the

inheritance or gift." In addition, numerous other states have recognized this cause of action. *See, e.g., Firestone v. Galbreath,* 67 Ohio St.3d 87, 88, 616 N.E.2d 202, 203 (1993); *In re Estate of Knowlson,* 204 Ill.App.3d 454, 149 Ill.Dec. 813, 816, 562 N.E.2d 277, 280 (1990); *Hammons v. Eisert,* 745 S.W.2d 253, 256–58 (Mo.Ct.App.1988) (surveying state jurisdictions that recognize the tort).

To recover for tortious interference with an expected inheritance, a plaintiff must prove the following elements: (1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized, but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with interference, such as fraud, duress, or undue influence; and (5) damages. *See Knowlson,* 149 Ill.Dec. at 816, 562 N.E.2d at 280. In this case, since the transfer of the house and its contents occurred at a different time than did the transfer of the certificates of deposits and joint savings account, we must determine whether the elements of the cause of action were fulfilled as to each transfer. In doing so, we hold that there was an expectancy that Sydney and Bill would share equally in Emily's estate after her death, that this expectancy was reasonably certain and that Sydney was damaged as to both transfers. The evidence supports the judgment that Bill intentionally and tortiously interfered with Emily's transfer of the certificates of deposits and joint savings account, but does not support the same for the transfer of the house and its contents.

### EXISTENCE OF EXPECTANCY

As to the existence of an expectancy, Emily had a substantial estate of $200,000 and Sydney and Bill were the only two children of Emily. There was testimony that Emily expressed great care and devotion towards both her children and had stated in her lifetime that she wanted her children to share her estate equally. Additionally, Emily's previous inter vivos gifts were to both Sydney and Bill in nearly identical amounts. The evidence established that Emily created an expectancy that her children would share her estate equally. The tort has frequently

been invoked when defendant caused the decedent to transfer valuable property which would have gone to plaintiff upon decedent's death. *Nemeth v. Banhalmi,* 99 Ill.App.3d 493, 55 Ill.Dec. 14, 425 N.E.2d 1187 (1981); *Cyr v. Cote,* 396 A.2d 1013 (Me.1979).

### REASONABLE CERTAINTY AND DAMAGES

The expectancy was reasonably certain since, at Emily's death, under the terms of her will and as a joint tenant, Sydney would have received half of her estate and the certificates of deposit and savings accounts in which she was a joint tenant with Emily. *Cf. Harmon v. Harmon,* 404 A.2d 1020, 1024 (Me.1979) (where a person can prove but for the tortious interference of another he would have received inheritance, such person is entitled to recover). Sydney was damaged because as a result of the transfers Bill received Sydney's joint certificates of deposit, joint savings account and her one-half expectancy in Emily's house and furniture. Holding that there is substantial evidence to support these three elements, we next discuss whether Bill intentionally interfered and exerted undue influence to deprive Sydney of her expectancy.

### TORTIOUS CONDUCT: EXERTION OF UNDUE INFLUENCE UPON THE TRANSFER OF CERTIFICATES OF DEPOSIT AND JOINT SAVINGS ACCOUNT

A presumption of undue influence arises when a confidential or fiduciary relationship exists and other suspicious circumstances are shown. *See In re Will of Ferrill,* 97 N.M. 383, 387, 640 P.2d 489, 493 (Ct.App. 1981), *cert. quashed,* 98 N.M. 51, 644 P.2d 1040 (1982). A presumption of undue influence is a presumption of fact and not a presumption of law; thus, its evidence is determined from the facts and circumstances of each particular case. *Montoya,* 113 N.M. at 110, 823 P.2d at 910. In addition, "because of the difficulty in obtaining direct proof in cases where undue influence is alleged, proof sufficient to raise the presumption is inferred from the circumstances." *Id.*

Our Supreme Court has held that a confidential or fiduciary relationship exists when trust and confidence is reposed by one person in the integrity and fidelity of another. *Id.* However, a parent-child relationship by itself is insufficient to create a fiduciary relationship. *Roybal,* 100 N.M. at 310, 669 P.2d at 1105. In addition to the parent-child relationship, Bill lived with Emily for the last five years of her life, and it was uncontradicted that Emily spoke highly of Bill and trusted and confided in him about her most crucial affairs. We find that the trial court's determination that a confidential relationship existed between Bill and Emily is supported by substantial evidence.

In addition to the confidential relationship, suspicious circumstances must be found to substantiate the trial court's finding of undue influence. *Montoya,* 113 N.M. at 110, 823 P.2d at 910. Circumstances found to be suspicious in undue influence cases include: (1) old age and weakened physical or mental condition; (2) lack of consideration; (3) unnatural or unjust disposition of the property; (4) participation of beneficiary in procuring the gift; (5) domination or control over the donor by the beneficiary; and (6) secrecy, concealment, or failure to disclose the gift by a beneficiary. *Id.*

## A. WEAKENED PHYSICAL OR MENTAL CONDITION

Ultimately, the effect of influence on Emily is what is at issue. As a result, evidence of mental weakness or susceptibility to influence is crucial. *In re Estate of Gonzales,* 108 N.M. 583, 586, 775 P.2d 1300, 1303, (Ct.App.1988), *cert. quashed,* 108 N.M. 197, 769 P.2d 731 (1989). In this case, Emily was seriously ill and bedridden the last ten months of her life. However, this fact alone does not rise to the level of suspicious circumstances. *Id.* What must be shown is that Emily's poor health affected her mental ability making her susceptible to undue influence. *Id.*

Emily suffered from chronic obstructive pulmonary disease from May until her death. Persons suffering from this disease may exhibit a fear of being left alone. Witnesses testified that Emily exhibited this fear. In fact, Emily's susceptibility to this fear was exemplified in early September when Bill told Emily that he was moving out of the house. Emily became very panicked, called Sydney in a worried state, and entered the hospital that same day. Shortly thereafter, the transfer of the certificates of deposit and joint savings account occurred. Clearly, Emily's fear of being left alone, caused by her illness, affected her mental ability and supports the conclusion that Emily was susceptible to undue influence.

## B. DISPOSITION OF THE PROPERTY

Bill challenges the judgment arguing that the disposition of Emily's property was not unnatural or unjust, since the court found that Sydney had strained her relationship with Emily and because Bill was taking care of his mother during the last years of her life. Bill argues that the transfers represent Emily's desire to reward him for coping with the burden of caring for her. Additionally, Bill asserts that it is not inequitable or unjust for a parent to make an unequal disposition where the beneficiary goes against the wishes of the parent as did Sydney. While this may be true in the abstract, it is not what the district court determined from the evidence in this case. The fact that there is other evidence upon which the trial court could have reached a different conclusion does not render its finding erroneous. *Jay Walton Enters., Inc. v. Rio Grande Oil Co.,* 106 N.M. 55, 60, 738 P.2d 927, 932 (Ct.App.), *cert. denied,* 106 N.M. 7, 738 P.2d 125 (1987). The issue on appeal is whether there is substantial evidence to support the judgment, not whether it would have supported a different result. *Sanchez v. Wohl Shoe Co.,* 108 N.M. 276, 279, 771 P.2d 984, 987 (Ct.App.), *writ dismissed,* 108 N.M. 217, 770 P.2d 539.

Evidence to the contrary indicates that Emily enjoyed a close relationship with both her children and she commented that she wanted Bill and Sydney to share her estate equally. She devised her estate equally, she gave Bill and Sydney equal shares of Chevron stock, and, before the transfers, she placed Bill and Sydney as joint tenants on equal amount of certificates of deposit and savings account. The transfers to Bill are

inconsistent with Emily's previously expressed intention regarding the disposition of her property, *Montoya*, 113 N.M. at 111–12, 823 P.2d at 1000–01 (mother's expressed intention to leave property to son and subsequent gift of property to person other than son supported conclusion that gift was unnatural), and the fact that Sydney failed to receive a substantial share of the estate supports the finding that the transfers were unnatural or unjust. *See Id.*

### C. PARTICIPATION IN THE PROCUREMENT

■ Bill contends that there is insufficient evidence to show that he participated in procuring the transfers. To the contrary, there is substantial evidence to support the court's finding that Bill participated in the transfer of the joint certificates of deposit and savings account. Bill testified that he truthfully told Emily that Sydney did not want to pay the income tax on the dividends of the Chevron stock. According to Bill, this news upset his mother and provided the reason for which Emily transferred the certificates of deposit and savings account. However, Bill also testified that he failed to tell Sydney that Emily was upset about her refusal to pay the taxes. In fact, Bill did not tell Sydney about the transfer of the certificates of deposit and savings account until a month after Emily's death.

Additionally, there was testimony that Bill, five days after Emily entered the hospital, went to the Bank of Ruidoso and discussed with the president of the bank what document was necessary to effectuate the transfer of the certificates of deposit and savings account from Sydney and Emily as joint tenants to him and his mother as joint tenants. Bill instructed the bank to prepare the letter and he personally picked up the letter and delivered it to his mother in the hospital. Although Bill was not present when Emily signed the letter in front of the hospital employee who notarized it, the notary's testimony shows that it took forty-five minutes to get Emily to sign the letter, because Emily kept saying, "I don't know why I have to sign this." Emily eventually signed the letter and soon thereafter Bill had the certificate of

deposit and savings account reissued in the names of Bill and Emily. There is evidence that Bill not only participated in the transfer of these certificates of deposit and the savings account, he initiated, pursued, and completed the entire process.

### D. SECRECY, CONCEALMENT, OR FAILURE TO DISCLOSE

The record is filled with evidence that Bill failed to disclose any information about the transfers to Sydney. Bill did not mention that Emily intended to and prepared to make these transfers. In fact, even after the transfers were completed, Bill failed to disclose the transfers until months later. The secrecy and concealment of these transfers is suspicious and supports the trial court's finding of undue influence. *See Roybal,* 100 N.M. at 310, 669 P.2d at 1105.

### E. DOMINATION AND CONTROL; CONSIDERATION

■ There is no direct evidence to support a finding that Bill dominated and controlled Emily. As stated, Emily's mental competency was not an issue at the time the inter vivos transfers were made. In fact, one witness testified that it seemed that Emily dominated Bill, rather than Bill dominating and controlling Emily. In reaching our holding, we considered the lack of evidence supporting this factor. However, "dominance by the grantee, when susceptible of direct proof, is merely one factor which raises a presumption that the grantor was unduly influenced, when there is also evidence of a confidential relation between the parties." *Ferrill,* 97 N.M. at 389, 640 P.2d at 495.

Also, there was conflicting evidence as to whether there was consideration for the transfer. Since we find that the evidence substantially supports the other elements and the judgment, we considered this element as a non-factor in this particular case.

■ In sum, evidence of Emily's fear of being left alone (which made her susceptible to undue influence), the unequal disposition of Emily's property which was contrary to Emily's intent that her estate be shared equally, Bill's involvement with the transfers

and his lack of disclosure of the transfers once executed, in conjunction with Bill's confidential relationship with Emily constitutes substantial evidence supporting the trial court's finding of undue influence as to the transfer of the certificates of deposits and joint savings account.

## INTENTIONAL INTERFERENCE WITH SYDNEY'S EXPECTANCY

■ We are not convinced by Bill's argument that the factors in Restatement, *supra*, Sections 766B, 767 and 772 are applicable in this situation. Unlike the factors considered in claims for tortious interference with prospective contracts, liability under this cause of action is limited to those who have interfered with the inheritance by means that are independently tortious in character. *Id.* at § 774B cmt. c.

> The usual case is that in which the third person has been induced to make or not to make a bequest or a gift by fraud, duress, defamation or *tortious abuse of fiduciary duty*, or has forged, altered or suppressed a will or a document making a gift.... Thus one who by legitimate means merely persuades a person to disinherit a child and to leave the estate to the persuader instead is not liable to the child.

In this type of case, the Restatement clearly discourages using an improper means and motive analysis, as used in prospective contract claims. Rather, the Restatement indicates that an independent finding that undue influence was exerted necessarily satisfies this requirement. Since we previously held that Bill procured the transfer of the savings account and certificates of deposits through undue influence, this element is fulfilled.

## TORTIOUS CONDUCT: EXERTION OF UNDUE INFLUENCE UPON THE TRANSFER OF THE HOUSE AND ITS CONTENTS

■ In contrast to the evidence supporting the trial court's finding of undue influence as to the transfer of the certificates of deposits and savings account, there is little evidence supporting the trial court's finding of undue influence as to the transfer of the house and its contents (the house). At the time of this transfer, there is no evidence that Emily's health affected her mental ability. Rather the evidence was that Emily herself sought the Vosses, abstractors in the county, by calling them to help her convey the house to Bill. Mr. Voss testified that he cautioned her about the effect of what she was doing, but that she gave the impression that she knew what she was doing. Emily read the documents transferring the house and willingly signed them. In addition, this transfer was not secreted, since, in June 1989 Emily told Sydney that she transferred the house to Bill and Sydney acquiesced. Furthermore, despite Bill preparing the inventory of furniture attached to the bill of sale, no other evidence was presented that he initiated or actively pursued and procured this transfer. Again, there is no evidence which would support a finding that Bill dominated or controlled Emily. For these reasons, we hold that the evidence fails to support the trial court's judgment that Bill exerted undue influence over Emily such that the transfer of the house is invalid.

## CONCLUSION

New Mexico now joins the majority in recognizing a cause of action for the intentional interference with an inheritance. Applying the elements to the facts, we affirm that there was sufficient evidence to support the trial court's finding that Bill intentionally interfered with Emily's inheritance as to the certificates of deposits and joint savings account in an amount equal to $49,000.00. However, the evidence did not support Sydney's contention that Bill intentionally interfered with the transfer of Emily's house and its contents and we reverse this part of the trial court's judgment.

IT IS SO ORDERED.

BLACK and FLORES, JJ., concur.