1999-NMCA-094

985 P.2d 1210

**Jane MOODY, Plaintiff/Appellee,**

v.

**Thomas B. STRIBLING and Martha Stribling, Defendants/Appellants,**

v.

**Steven R. Stribling, Defendant/Cross–Appellant.**

**No. 18,875.**

Court of Appeals of New Mexico.

May 25, 1999.

Certiorari Denied, Nos. 25,798, 25,802, July 6, 1999.

Alice Tomlinson Lorenz, Alan C. Torgerson, Miller, Stratvert, & Torgerson, P.A., Albuquerque, for Appellee.

J. Edward Hollington, J. Edward Hollington & Associates, P.A., Albuquerque, Diane P. Donaghy, Tijeras, for Appellants.

Paul Cohen, Albuquerque, for Cross–Appellant.

## OPINION

**WECHSLER, Judge.**

{1} Tom and Martha Stribling appeal from a judgment in favor of Jane Moody finding that they breached their fiduciary duty to Jane and awarding her $324,604 in damages. They raise the following issues on appeal: (1) Jane was not the real party in interest; (2) the district court committed reversible error by failing to join necessary parties; (3) the district court improperly found that Tom and Martha owed Jane a fiduciary duty; (4) if Tom and Martha owed Jane a fiduciary duty, substantial evidence does not support that Tom and Martha breached that duty; (5) the district court improperly voided the Purchase and Option Agreement; and (6) if Tom and Martha owed a duty and breached it, the measure of damages was improper. Steven Stribling also appeals the judgment entered against Tom and Martha in favor of Jane alleging that the district court violated his due process rights in awarding improper damages to Jane. We affirm the judgment of the district court.

*Facts*

{2} Jane and Steven, as husband and wife, purchased two Supercuts franchises and formed S Corporations to hold title to each franchise. SJS Corporation (SJS) held the Las Cruces Supercuts which had been purchased in 1983 using joint assets. In 1989, Jane pledged her separate property as collateral to enable the couple to purchase a Supercuts franchise located in Texas. Jane and Steven formed SSI, Inc. (SSI) to hold the Texas franchise. Although Steven primarily handled the financial matters, Jane invested considerable separate assets in the businesses and other investments. Jane ran their household and cared for their son.

{3} In late 1991, Jane and Steven ran into serious financial difficulties most likely attributable to Steven's drug addiction but exacerbated by Jane's progressive loss of confidence in her ability to understand and make judgments about the couple's financial situation, which may have been related to Jane's problems with anxiety and depression. The Internal Revenue Service (IRS) prepared to levy tax liens on the businesses, and Jane and Steven owed considerable personal taxes as well. Additionally, the businesses were behind on state tax payments. Steven went to his parents, Tom and Martha, for assistance. Tom and Martha agreed to help Jane and Steven. Tom and Martha owned their own Supercuts franchises in New Mexico and elsewhere, and agreed to purchase and run Jane and Steven's franchises for five years. Tom and Martha obtained a loan for $260,000 for the purchase amount, but instead of giving the money to Jane and Steven outright, Tom and Martha placed the money in an account and had Phyllis Isbell, their business manager and bookkeeper, pay business debts of the two franchises and Jane and Steven's personal debts from the account. Both Tom and Martha also negotiated on behalf of Jane and Steven with federal and state tax authorities about the tax liability.

{4} Tom, Martha, Steven, and Jane executed a Buy–Back Agreement, prepared by an attorney contacted by Steven, which memorialized the assistance Tom and Martha were to provide Jane and Steven so they would not lose their home and the franchises. After execution of the Buy–Back Agreement, Tom and Martha's attorney-son, Tom Jr., reviewed the document and prepared new documents because he did not believe the agreement adequately protected his parents' interests. Although the new agreements which Tom Jr. prepared were not the same as the Buy–Back Agreement, Steven represented them to Jane as being the same.

{5} Tom and Martha controlled the $260,000 obtained to purchase the franchises. They made additional deposits to the account from store revenues and also deposited a small salary that Tom and Martha's corporations paid to Steven. They directed Isbell to make payments for Jane and Steven's business and personal debts from these funds. Isbell did so for several months until Jane and Steven separated. At that point, Martha indicated there were no funds remaining from the loan and directed Isbell to void a payment on Jane's vehicle. Funds from the account continued to pay for Steven's expenses.

{6} Jane lost the businesses, her home, and her car. She sued Tom and Martha, their corporations, Tom Jr., and Steven for breach of fiduciary duty, breach of contract, and other claims. The district court, in a bench trial, found that Tom and Martha owed a fiduciary duty to Jane and that they breached that duty. The court awarded Jane $324,604 in damages. The district court did not find that Steven breached a fiduciary duty; thus he incurred no liability. Further, the district court did not find any liability on behalf of Tom and Martha's corporations or Tom Jr.

*Real Party in Interest*

{7} Tom and Martha contend that the district court erred in failing to grant their motion to dismiss on lack of standing and failure to join an indispensable party filed on the first day of trial. On appeal, as below, they argue that Jane was not the real party in interest under Rule 1–017(A) NMRA 1999 because SJS and SSI, not Jane, suffered any alleged injury which occurred. After argument, the district court denied the motion as untimely and also stated that it tentatively agreed with "the posture" presented by Jane that any alleged injury was to Jane, not to SJS and SSI.

{8} A real party in interest is one who owns the right being enforced or who is in a position to discharge the defendant from liability. *See Edwards v. Mesch,* 107 N.M. 704, 706, 763 P.2d 1169, 1171 (1988). According to Tom and Martha, they base their position on the proposition that when a corporation suffers injury, its shareholders cannot bring individual claims against a third party for the injuries. *See Delta Automatic Sys., Inc. v. Bingham,* 1999–NMCA–029, ¶ 14, 126 N.M. 717, 974 P.2d 1174. We agree with this general proposition. A corporation, not its individual shareholders, may bring claims "for injuries that derive from damage to the corporation." *Id.* ¶ 14. At oral argument Tom and Martha also referred us to our recent decision in *Crumpacker v. DeNaples,* 1998–NMCA–169, 126 N.M. 288, 968 P.2d 799, discussing Rule 1–017. We fail to see how *Crumpacker* helps Tom and Martha's position as we agree with them that

only a real party in interest may pursue claims. We disagree, however, with Tom and Martha's characterization of the claims.

{9} Rather than alleging claims for damages to the corporation, Jane alleged claims for injuries she personally incurred for loss of property, namely breach of fiduciary duty owed to her and breach of contract. The property she claims to have lost includes the ownership of SJS and SSI. *See Seckler v. Star Enter.,* 124 F.3d 1399, 1406 (11th Cir. 1997) (upholding the plaintiff's right to bring cause of action when the plaintiff alleged that the defendant's failure to make a bona fide offer to sell a service station to his corporation caused the plaintiff to sell his house for less than its fair market value and that he suffered emotional distress as a result of the misrepresentations and breach); *cf. Delta Automatic Sys., Inc.,* 1999–NMCA–029, ¶¶ 2, 16, 126 N.M. 717, 974 P.2d 1174 (affirming dismissal of shareholders' claims for failure to satisfy exception to rule that bars suits by shareholders for injuries to corporations). As such, the corporations are part of the damages; they did not suffer the damages alleged in the complaint. Jane was the real party in interest because only she, not SJS and SSI, could discharge Tom and Martha from their liability for breach of fiduciary duty owed to her. *See Edwards,* 107 N.M. at 706, 763 P.2d at 1171.

*Joinder of Party Necessary for Just Adjudication*

{10} Tom and Martha alternately argue that SJS and SSI were parties necessary for just adjudication under Rule 1–019 NMRA 1999, and the district court's failure to include them as parties was error. A motion to dismiss for failure to join an indispensable party under Rule 1–019 may be made at any time, including "at the trial on the merits." Rule 1–012(H)(2); *cf. C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.,* 112 N.M. 89, 91, 811 P.2d 899, 901 (1991) (stating that Rule 1–019 motion may even be raised for first time on appeal). As a result, such a motion cannot be dismissed as untimely, but must be dismissed on the merits. While the district court erred in denying Tom and Martha's Rule 1–019 motion as untimely, it also

denied the motion on the merits when it ruled that it tentatively agreed with "the posture" of arguments that SJS and SSI were not parties necessary for just adjudication. We review this decision for abuse of discretion. *See C.E. Alexander & Sons, Inc.*, 112 N.M. at 91, 811 P.2d at 901.

{11} When ruling on a Rule 1–019 motion, the district court conducts a "balancing test to determine whether a suit can continue without a party." *C.E. Alexander & Sons, Inc.*, 112 N.M. at 91, 811 P.2d at 901. Rule 1–019(A) reads in pertinent part:

A. **Persons to be joined if feasible.** A person who is subject to service of process shall be joined as a party in the action if:

(1) in his absence complete relief cannot be accorded among those already parties; or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may:

(a) as a practical matter impair or impede his ability to protect that interest; or

(b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest.

{12} Tom and Martha's Rule 1–019 argument, both at the district court and on appeal, is linked to their argument that Jane is not the real party in interest. At the district court, Tom and Martha combined their Rule 1–017 and Rule 1–019 arguments and relied on *Marchman v. NCNB Texas National Bank*, 120 N.M. 74, 898 P.2d 709 (1995). They argued that based on *Marchman*, Jane could not bring these claims herself. *Marchman* stands for the proposition that a shareholder cannot bring a claim for injuries to the corporation. *See id.* at 81, 898 P.2d at 716. We have already discussed this issue above and reiterate that Jane brought claims for alleged injuries to herself, not to SJS and SSI. Thus, the corporations' absence would not fail to protect their interests, because their interests were not affected by the claims.

{13} On appeal, Tom and Martha repeat the same argument from below and direct this Court to *Meeker v. Walker*, 80 N.M. 280, 454 P.2d 762 (1969). They contend that *Meeker* controls, and because SJS and SSI owned the franchises, any alleged injury occurred to the corporations rather than to Jane. As a consequence, according to Tom and Martha, the absence of SJS and SSI fails to protect the corporations' interests. However, *Meeker* does not change our rationale discussed above with regard to the *Marchman* case.

{14} *Meeker* involved claims for fraud and negligence in connection with the purchase of oil royalty interests. *See id.* at 281, 454 P.2d at 763. Meeker was the owner of a closely-held corporation and brought the action in his name only. The purchase agreement, however, was between Walker and Meeker's corporation, not Meeker individually. *See id.* at 282, 454 P.2d at 764. Our Supreme Court affirmed the district court's dismissal of the case for failure to join an indispensable party, because the corporation, not Meeker, was the party entering into the purchase agreement. *See id.* at 283, 454 P.2d at 765. As discussed above, in the present case, Jane raises claims of alleged injuries to her, not to SJS and SSI.

{15} In the district court, Tom and Martha further argued that failure to join SJS and SSI would violate Rule 1–019(A)(2)(b) in that they could be exposed to multiple obligations because "if the Court were to award any relief, ... who is entitled to that relief." However, because the district court found that the claims belonged to Jane, not SJS and SSI, this lawsuit does not expose Tom and Martha to possible multiple obligations because the claims belonged only to Jane and any relief awarded would be only for damages Jane suffered. *See Gwartz v. Jefferson Mem'l Hosp. Ass'n*, 23 F.3d 1426, 1429–30 (8th Cir.1994) (refusing to find indispensable the plaintiff's corporation because claims were for injury which occurred to the plaintiff and not his corporation). The corporations could conceivably have a different claim against Tom and Martha for different damages, but since Jane's claims are her own, it is not possible that Tom and Martha could

incur multiple obligations for the same injury. *See id.* at 1430. Thus, Tom and Martha did not meet their burden of proving that failure to join SJS and SSI would not afford the parties complete relief, would impair or impede recovery, or create potential multiple liabilities. *See* Rule 1–019(A). Because SJS and SSI were not parties necessary for just adjudication, the district court did not abuse its discretion in refusing to dismiss the case under Rule 1–019. *See C.E. Alexander & Sons, Inc.,* 112 N.M. at 91, 811 P.2d at 901.

*Fiduciary Duty*

{16} The district court found that Tom and Martha and their corporation, MTS, "were in a fiduciary position" with Jane prior to execution of the agreements because MTS had taken over management functions of both Supercuts franchises and for "having assumed responsibility for negotiating with the IRS" on Jane and Steven's behalf. Tom and Martha argue that the district court did not have a legal basis to find that they owed a fiduciary duty to Jane.

{17} We determine "whether a particular defendant owes a duty to a particular plaintiff" as a question of law, and as such, de novo. *Calkins v. Cox Estates,* 110 N.M. 59, 62, 792 P.2d 36, 39 (1990). Our Courts recognize that a fiduciary duty or confidential relationship can exist in a variety of contexts depending upon whether the relationship between the parties is one of trust and confidence. *See, e.g., Allsup's Convenience Stores, Inc. v. The North River Ins. Co.,* 1999–NMSC–006, ¶ 37, 127 N.M. 1, 976 P.2d 1 [Vol. 38, No. 6, SSB 8] (insurer-insured); *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 11, 125 N.M. 269, 960 P.2d 811 (testator-beneficiary); *GCM, Inc.,* 1997–NMSC–052, ¶ 19, 124 N.M. 186, 947 P.2d 143 (between business partners); *State ex rel. Udall v. Colonial Penn Ins. Co.,* 112 N.M. 123, 131, 812 P.2d 777, 785 (1991) (investment advisor-client); *Kern v. St. Joseph Hosp., Inc.,* 102 N.M. 452, 456, 697 P.2d 135, 139 (1985) (physician-patient); *Swallows v. Laney,* 102 N.M. 81, 84, 691 P.2d 874, 877 (1984) (real estate broker-principal); *In re Nelson,* 79 N.M. 779, 780, 450 P.2d 188, 189 (1969) (per curiam) (attorney-client); *Doughty v. Morris,* 117 N.M. 284, 289, 871 P.2d 380, 385 (Ct.App.1994) (mother-child); *In re Estate of Bivians,* 98 N.M. 722, 731, 652 P.2d 744, 753 (Ct.App.1982) (husband-wife).

{18} While both this Court and the Supreme Court have used different definitions for recognizing a fiduciary or confidential relationship, each definition conveys essentially the same meaning. The most recently restated definition is " '[a] fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.' " *Allsup's Convenience Stores, Inc.,* 1999–NMSC–006, ¶ 37, 127 N.M. 1, 976 P.2d 1 (quoting *Colonial Penn Ins. Co.,* 112 N.M. at 131 n. 9, 812 P.2d at 785 n. 9); *accord Swallows,* 102 N.M. at 84, 691 P.2d at 877. In cases involving wills and undue influence, the definition most widely-used by our Courts is " '[a] confidential or fiduciary relationship exists when one person places trust and confidence in the integrity and fidelity of another.' " *In re Estate of Gersbach,* 1998–NMSC–013, ¶ 11, 125 N.M. 269, 960 P.2d 811 (quoting *In re Estate of Keeney,* 121 N.M. 58, 61, 908 P.2d 751, 754 (Ct.App.1995)); *accord In re Ferrill,* 97 N.M. 383, 387, 640 P.2d 489, 493 (Ct.App. 1981). Similarly, Black's Law Dictionary 625 (6th ed.1990) defines "fiduciary" as "[a] person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking."

{19} Such a relationship can exist in almost any context. We refuse to conclude, as a matter of law, that a fiduciary or confidential relationship cannot exist in this case.

{20} Tom and Martha also argue that because no special relationship or fiduciary duty can exist presumptively between a parent and child, no fiduciary relationship can exist here between a child's spouse and his or her in-laws. *See Roybal v. Morris,* 100 N.M. 305, 310, 669 P.2d 1100, 1105 (Ct. App.1983). Although there is not a presumption of a fiduciary relationship between a parent and a child, in both *Roybal* and *Doughty,* this Court upheld the existence of a confidential relationship between a parent and child. In *Roybal,* the evidence showed

that the father relied on his daughter, with whom he lived after suffering a debilitating illness, for all of his care in personal and financial matters. *See* 100 N.M. at 310, 669 P.2d at 1105. The father "was dependent on [the daughter], he placed great trust in her, she made decisions for him, she handled his money, wrote his checks, made his deposits, fed, housed and nursed him." *Id.* This evidence was sufficient to support the finding of a fiduciary relationship. *See id.*

{21} In *Doughty,* we upheld the finding of a confidential relationship between a mother and son when the son shared a home with the mother in the last stages of her life. *See* 117 N.M. at 286, 871 P.2d at 382. The evidence showed that once the mother became very ill she "trusted and confided in him about her most crucial affairs." *Id.* at 289, 871 P.2d at 385. In both of these cases, as in our other cases upholding the existence of a fiduciary or confidential relationship, the confidential or fiduciary relation existed not because of the parent-child relationship, but because the relationship, regardless of existing between a parent and a child, was one of trust and confidence. We thus turn to examine whether substantial evidence supports the district court's finding of a fiduciary relationship. *See id.* at 287, 871 P.2d at 383.

### Tom and Martha's Involvement in Jane's Personal Finances

{22} Martha became involved with Jane and Steven's financial difficulties early on, at least from the time Steven learned of their federal and state tax liability. Tom and Martha offered to help Jane and Steven by purchasing the stores for $260,000. Martha took it upon herself to gather Jane and Steven's personal financial information and write and call many of their creditors asking for relief. Martha and Tom negotiated with the IRS and state taxation department to reduce Jane and Steven's tax liability and avoid the filing of a foreclosure lien on the stores. Martha gave advice to Jane and Steven on protecting their personal belongings from IRS foreclosure and went with them to a bankruptcy attorney for advice. Jane understood that Tom and Martha were helping her (and Steven) out of serious financial difficul-

ties, as evidenced by the Buy–Back Agreement which indicated that Tom and Martha agreed to help Jane and Steven "because of their love and affection ... and not for financial gain."

### Tom and Martha's Involvement in Jane and Steven's Corporations

{23} Tom and Martha were knowledgeable of all of the business affairs of SJS and SSI prior to the execution of the Buy–Back Agreement and the later Purchase and Option Agreement. Beginning November 1, 1991, Tom and Martha's office manager assumed the same types of bookkeeping services (payroll, paying bills, reconciling bank statements, preparing financial and franchise statements) she provided Tom and Martha's corporations for SJS and SSI, with the exception of the preparation of financial statements. Isbell obtained twenty-five boxes of Jane and Steven's personal and business records from their prior bookkeeper. Tom determined the financial status of the stores from reviewing the financial records. At the request of Tom and Martha, in the middle of December 1991, Isbell reviewed the boxes of records and compiled lists of Jane and Steven's creditors and outstanding tax liability.

### Tom and Martha's Control of the $260,000 Loan

{24} Isbell explained that after Tom and Martha obtained the $260,000 loan to purchase the businesses from Jane and Steven, they established an account and she paid business and personal bills from the account. They did not turn over the money to Jane and Steven to handle payment of their own bills. Isbell made periodic deposits into the account out of revenues from the two stores, although at times the revenue might have come from other stores. At the direction of Tom and Martha, she deposited Steven's paychecks into that account, collected and destroyed Jane and Steven's credit cards, and paid personal bills from the account. Martha or Tom monitored the checks drawn from the account, including checks written for house payments, utilities, cars, and schooling. They did not discuss these payments or transactions with Jane. After

making these payments for several months, Steven told Isbell, which was confirmed by Martha, to void a car payment for Jane's car. After the $260,000 was exhausted, Tom and Martha directed Isbell to "loan" money to the account from their other corporate accounts. Jane was not informed of these transactions. After Jane and Steven separated, more checks for Steven's personal expenses were issued from the account.

{25} The attorney representing Jane and Steven also provided advice to Tom and Martha and prepared the Buy–Back Agreement using language suggested by Martha. The attorney also made statements to Martha as to whether the Buy–Back Agreement was a good idea. The attorney was familiar with Tom and Martha's businesses and assets.

{26} This evidence of the manner in which Tom and Martha took charge of Jane and Steven's financial lives gives rise to an inference that Jane trusted and relied upon Tom and Martha, supporting the district court's finding of a fiduciary relationship. *See Clovis Nat'l Bank v. Harmon,* 102 N.M. 166, 168–69, 692 P.2d 1315, 1317–18 (1984) (noting that appellate court indulges all reasonable inferences to support the verdict). Substantial evidence thus supports the district court's finding that Tom and Martha placed themselves in a position of trust and confidence with respect to Jane prior to execution of the Buy–Back Agreement. *See In re Estate of Strozzi,* 120 N.M. 541, 545, 903 P.2d 852, 856 (Ct.App.1995) (stating that substantial evidence supported finding of a confidential relationship when testimony indicated that fiduciary had a "continual presence" in all aspects of the beneficiary's life and handled all finances); *see also Montoya v. Torres,* 113 N.M. 105, 111, 823 P.2d 905, 911 (1991) (upholding finding of a confidential relationship in a quiet title suit in which the donor placed trust and reliance on donee and donee's parents for "her business affairs[,] . . . assistance and advice"); *Doughty,* 117 N.M. at 289, 871 P.2d at 385; *Roybal,* 100 N.M. at 310, 669 P.2d at 1105.

*Breach of Fiduciary Duty*

{27} Tom and Martha argue that the district court could not find a breach

of fiduciary duty without a finding of fraud. They reason that because the court concluded that neither Tom nor Martha acted fraudulently, this case must be reversed in that substantial evidence does not support the court's decision. However, fraud is not an element for breach of fiduciary duty, and the district court did not have to find fraud in order to find a breach of fiduciary duty. A fiduciary duty is a duty of loyalty. *See In re Estate of McKim,* 111 N.M. 517, 522, 807 P.2d 215, 220 (1991); *Trujillo v. Puro,* 101 N.M. 408, 411, 683 P.2d 963, 966 (Ct.App. 1984). Since "[a] fiduciary is obliged 'to act primarily for another's benefit in matters connected with such undertaking[,]' [a] fiduciary breaches this duty by placing his interests above those of the beneficiary." *Kueffer v. Kueffer,* 110 N.M. 10, 13, 791 P.2d 461, 464 (1990) (citation omitted). To be actionable for damages, harm must also result from the breach. *See Turpin v. Smedinghoff,* 117 N.M. 598, 601, 874 P.2d 1262, 1265 (1994) (awarding attorney fees in breach of fiduciary duty case requires showing of harm caused by the breach).

{28} It is unclear whether Tom and Martha also argue that even without requiring fraud, substantial evidence does not support the district court's finding of breach of fiduciary duty. Despite the lack of clarity of their argument, we examine whether substantial evidence supports the district court's finding of breach of fiduciary duty in order to determine if the damages award, which Tom and Martha also challenge and we discuss in the next section, was proper.

{29} The district court found that Tom and Martha entered into a fiduciary relationship prior to the execution of the Buy–Back Agreement and remained in this relationship throughout the execution of the Buy–Back Agreement, Purchase and Option Agreement, and payment of Jane and Steven's living expenses. The district court generally found that "Tom and Martha acted negligently and breached their fiduciary duties." The court further noted as specific examples of breach of fiduciary duty that Tom and Martha: paid debts owed to their own corporations and their attorney-son, Tom Jr., from proceeds of the account; failed to account to

Jane for payments made; and did not advise Jane that the Purchase and Option Agreement differed from the Buy–Back Agreement.

{30} The application of equitable doctrines and the granting of equitable relief rests in the sound discretion of the district court. Absent an abuse of discretion, we will not disturb the district court's exercise of its equitable jurisdiction on appeal. Generally, we find an abuse of discretion only when the district court's decision is contrary to logic and reason. *See Wolf & Klar Cos. v. Garner*, 101 N.M. 116, 118, 679 P.2d 258, 260 (1984); *In re Estate of Gardner*, 114 N.M. 793, 800–01, 845 P.2d 1247, 1254–55 (Ct.App. 1992). We examine the findings and determine if substantial evidence supports these findings; if it does, we will not find an abuse of discretion. *See In re Estate of Gardner*, 114 N.M. at 800–01, 845 P.2d at 1254–55.

{31} Tom and Martha were in a fiduciary relationship with respect to Jane because they handled Jane's financial affairs, negotiated with the IRS and state tax authorities, and ran the businesses on her behalf. These actions all took place before and after execution of the Buy–Back Agreement. While in a fiduciary relationship, Martha misinformed Jane of the amount Jane and Steven owed to the IRS; Martha and Steven told Jane that Jane's father refused to help, that liens had been or would be filed on everything, that they would lose everything, including the house, and that the bank had declined to make them a loan. These statements were either false or misrepresentations. They were a breach of fiduciary duty because Martha had an obligation to be scrupulously honest with Jane in the handling of Jane's financial affairs which Jane had entrusted to her.

{32} Martha told Jane that she and Tom would help Jane and Steven and not let them lose their businesses. Martha further told Jane that she and Tom would borrow $260,-000 and would take control of the stores for five years, after which, Jane and Steven could repurchase the stores for $1. The parties entered into the Buy–Back Agreement incorporating these terms, which the district court found to represent the agreements reached by the parties.

{33} However, after signing the Buy–Back Agreement, Tom and Martha consulted with their attorney-son, Tom Jr. Tom Jr. prepared the Purchase and Option Agreement to better protect his parents' interests. Despite being in a fiduciary relationship with Jane, neither Tom nor Martha explained to Jane the differences between the Buy–Back Agreement and the Purchase and Option Agreement. The court found the Purchase and Option Agreement did not reflect the agreements reached by the parties and expressed in the Buy–Back Agreement. The Buy–Back Agreement was a personal contract between Tom and Martha and Jane and Steven. The later Purchase and Option Agreement was between the corporations and more formalized. Because a fiduciary owes the highest degree of loyalty to those who are entrusted to him or her, contracts entered into between a fiduciary and beneficiary are suspect. *Cf.* Restatement (Second) of Contracts § 173 (1981) (stating that a fiduciary-beneficiary contract is voidable by the beneficiary if unfair and beneficiary did not have full understanding of its legal rights or fiduciary did not disclose all relevant facts). Tom and Martha breached their fiduciary duty to their beneficiary Jane because they entered into the later agreement with her to better secure their own positions vis-a-vis Jane's without fully describing the facts and circumstances to her.

{34} Tom and Martha also breached their fiduciary obligations by using the account established for Jane and Steven for their own purposes to pay their own corporations and their attorney-son for preparation of the Purchase and Option Agreement.

{35} We conclude that there was substantial evidence that Tom and Martha as fiduciaries placed their own interests above the interests of their beneficiary, Jane, in executing the Buy–Back Agreement, misappropriating funds, and replacing the Buy–Back Agreement with the Purchase and Option Agreement. *See Kueffer*, 110 N.M. at 13, 791 P.2d at 464; *In re Estate of Gardner*, 114 N.M. at 800–02, 845 P.2d at 1254–56. Thus, we conclude that the district court did not abuse its discretion.

*Amount of Damages*

{36} Tom and Martha argue that substantial evidence does not support the amount of damages awarded to Jane. They specifically contend that the $324,604 awarded is not commensurate with her 50% ownership in the businesses. They further contend that the amount is not proximately related to the court's findings that Tom and Martha misappropriated $31,215 in damages. Finally, they claim that even the $31,215 amount of damages is not supported by substantial evidence.

{37} We review findings of damages to determine whether they are supported by substantial evidence. *See Jacobs v. Phillippi,* 102 N.M. 449, 451, 697 P.2d 132, 134 (1985). Damages need not be proven with mathematical certainty. *See Nosker v. Western Farm Bureau Mut. Ins. Co.,* 81 N.M. 300, 302, 466 P.2d 866, 868 (1970). In the case on appeal, the district court awarded compensatory damages. "The purpose of compensatory damages is to make the injured party whole by compensating it for losses." *Central Sec. & Alarm Co. v. Mehler,* 1996–NMCA–060, ¶ 11, 121 N.M. 840, 918 P.2d 1340.

> [O]nce the plaintiff establishes a right to compensatory damages for a particular harm, the amount of the plaintiff's award is determined in the same way regardless of the legal theory under which the plaintiff recovers. The reason is that, in determining the amount of damages to be awarded, the focus shifts to the objective of such an award: to fully compensate the plaintiff and to put the plaintiff in as good a position as if the harm or injury had not occurred.

*Id.* ¶ 17 (citations omitted).

{38} Tom and Martha argue that the only logical conclusion for the amount awarded is found by taking the value of the businesses ($552,000), subtracting the loan amount ($260,000), and adding in the specific amounts found to be converted for Tom and Martha's use ($31,215). Of the resulting amount ($323,215), they contend that Jane would be entitled to at most half because of her 50% ownership of the businesses. The district court was not required to itemize its damages. Although the court did not explain how it arrived at the figure, Tom and Martha's assertion of the only logical calculation is clearly wrong in light of the district court's conclusion that Tom and Martha were not entitled to credit for the full $260,000 because they failed to provide an accounting. *See In re Estate of McKim,* 111 N.M. at 522, 807 P.2d at 220 ("The existence of the fiduciary relationship was all that was necessary to establish constructive trusts."). The court concluded that Tom and Martha were entitled to a credit of the amount conceded by Jane as appropriate and necessary expenditures from the account, which amounted to $162,793.

{39} Jane offered several alternative constructions of damages at oral argument to show that the court could have awarded considerably higher damages than it did. Jane argued that damages under an unjust enrichment theory could total $840,000 and that compensatory damages could total $1,000,000. We find fault with both of these assumptions as they overlap damages by including the value of the businesses, lost profits, and the amount paid for the businesses.

{40} However, there are methods of calculating damages such that the amount is greater than the $324,000 awarded. As long as there is a reasonable method used to achieve an amount of damages, we will accept that amount. *See Naranjo v. Paull,* 111 N.M. 165, 172, 803 P.2d 254, 261 (Ct.App. 1990) ("Once damage is established, appellate courts will be reluctant to reverse an award on the ground that the amount is too speculative.").

{41} The district court found the businesses valued at $552,000. The court also had evidence that the profits Jane lost because she was deprived of ownership of the businesses amounted to approximately $180,000. Additionally, Jane could not account for approximately $100,000 of the $260,000 controlled in the account by Tom and Martha for her and Steven's benefit. Adding these sums, under the particular facts of this case, the district court could have awarded $832,000. Consequently, we do not find the dis-

trict court's award of $324,604 speculative or unreasonable. *See Sierra Life Ins. Co. v. First Nat'l Life Ins. Co.,* 85 N.M. 409, 414, 512 P.2d 1245, 1250 (1973) ("This Court will not attempt to second guess the trial court's determination of the proper measure to be applied for damages if the trial court had several alternatives before it supported by substantial evidence.").

{42} Even taking into consideration Tom and Martha's argument that Jane might only be entitled to half the damages because she owned only half the businesses, the award of $324,604 is still sustainable. Assuming that argument tò be correct only for the sake of this discussion, half of the value of the businesses and lost profits equals $366,000, still greater than the $324,604 awarded. Based upon the damages awarded, the district court could have considered this argument in arriving at its damages. Since substantial evidence would support an award of an even greater amount of damages, substantial evidence certainly supports the award of $324,604. *See Jacobs,* 102 N.M. at 451, 697 P.2d at 134.

{43} We also find without merit, Tom and Martha's other arguments that if any damages should be awarded, the amount should be only $31,215, and that even substantial evidence does not support that amount. As discussed above, under one reasonable theory the amount of damages could have been as high as $832,000. The district court found both general and specific breaches of fiduciary duty by Tom and Martha. We need not decide if substantial evidence supports the findings of the amounts for the specific breaches because Jane offered evidence that damages from the general breach of fiduciary duty could have totaled as much as $832,000. We conclude that there was substantial evidence to support the district court's damage award.

*Defendant Steven Stribling's Cross–Appeal*

{44} Citing the Fourth and Fifth Amendments to the United States Constitution and article II, section 18 of the New Mexico Constitution, Steven filed a cross-appeal claiming that the district court violated his due process rights by applying an improper theory of damages in awarding Jane $324,604. Steven claims that the district court awarded Jane the value of the franchises as damages and that he and Jane entered into a marital settlement agreement in which he and Jane each continued to own their respective shares of the corporations. Thus, he concludes that he has been deprived of a property right. We find no merit in his argument for several reasons.

{45} First, Steven concedes he did not preserve this issue below because he failed to invoke a ruling or decision by the district court. He argues that we should entertain his appeal because it involves due process. *See* Rule 12–216 NMRA 1999. Due process claims are not exempt from the fundamental requirement of preservation. *See State v. Sosa,* 1997–NMSC–032, ¶ 23, 123 N.M. 564, 943 P.2d 1017; *State ex rel. Human Servs. Dep't v. Martin,* 104 N.M. 279, 280, 720 P.2d 314, 315 (Ct.App.1986).

{46} Second, Steven further contends that the earliest he could raise this argument was on appeal because he had no way of knowing that the district court would award Jane his half of the value of the businesses. We disagree. As we have discussed, we do not necessarily include a portion of his ownership of the businesses. Also, Steven never alerted the district court as to the percentage ownership of the businesses or of the marital settlement agreement. Steven had alternatives. If he was concerned about possible pecuniary loss, he could have filed a cross-claim against his parents. Additionally, he could have raised this issue in a post-judgment motion to the district court.

{47} Third, Steven did not sustain a judgment against him in district court. He incurred no liability. In order to appeal, a party must be aggrieved. *See Galvan v. Miller,* 79 N.M. 540, 548, 445 P.2d 961, 969 (1968) ("[O]nly a party ... who is aggrieved or prejudiced by the decision of the trial court may appeal."); *Fierro v. Murphy,* 85 N.M. 179, 180, 510 P.2d 112, 113 (Ct.App. 1973) (refusing to consider one defendant's appeal when nothing in the record indicated that he was an aggrieved party and no judg-

ment was entered against him). "To be aggrieved, a party must have a personal or pecuniary interest or property right adversely affected by the judgment. The party's interest must be immediate, pecuniary, and substantial, not nominal or a remote consequence of judgment." *St. Sauver v. New Mexico Peterbilt, Inc.*, 101 N.M. 84, 85–86, 678 P.2d 712, 713–14 (Ct.App.1984) (citation omitted).

{48} Steven has no pending judgment against him nor any property right at interest. The district court awarded monetary damages, not title to the franchises to which Steven may arguably be entitled to a half interest. The district court did not make any findings as to ownership of shares in SJS and SSI or acknowledge the marital settlement agreement, presumably because it found no liability on the part of Steven. Any possible grievance on the part of Steven is not immediate; it is a remote consequence. He is not aggrieved for the purposes of appeal.

{49} We affirm the district court's judgment on the cross-appeal. We agree with Jane's assessment of Steven's cross-appeal as frivolous and with her request for attorney fees and costs. Because we are unable to readily assess a reasonable amount of attorney fees in defending Steven's cross-appeal, we remand to the district court to make the determination. We also order that the fees and costs awarded to Jane be borne equally by Steven and his attorney as his attorney shares responsibility for initiating and proceeding with the cross-appeal.

*Conclusion*

{50} We conclude that the district court was correct in finding that Jane was the real party in interest and that SJS and SSI were not necessary and indispensable parties. We affirm the district court's finding that Tom and Martha owed and breached their fiduciary duty to Jane and the district court's award of damages. We affirm the district court on the cross-appeal and remand for the determination of attorney fees and costs in connection with Steven's cross-appeal. The amount shall be divided equally between Steven and his attorney.

{51} **IT IS SO ORDERED.**

APODACA and BUSTAMANTE, JJ., concur.