**In re Vickie Lynn MARSHALL, Debtor.**

**E. Pierce Marshall, Plaintiff,**

v.

**Vickie Lynn Marshall, Defendant.**

**Vickie Lynn Marshall, Counterclaimant,**

v.

**E. Pierce Marshall, Counterdefendant.**

**Nos. LA 96–12510–SB, LA 96–01838–SB.**

United States Bankruptcy Court, C.D. California.

Oct. 6, 2000.

---

widow of J. Howard Marshall II, who was said to be the richest man in Texas.[1] Nonetheless, E. Pierce Marshall, J. Howard's [2] second son from a prior marriage, contends in the probate case now in trial in Probate Court in Houston, Texas that J. Howard died essentially penniless. In this adversary proceeding the court finds that Pierce tortiously interfered with Vickie's expectancy of an *inter vivos* gift that J. Howard instructed his attorneys to arrange.

The court finds that Vickie has suffered damages in the amount of $449,-754,134, less whatever she receives from the probate of J. Howard's estate. These damages are mainly based on sanctions imposed on Pierce for his egregious discovery abuse in this adversary proceeding. A final calculation of the damages remains to be determined upon the completion of the probate case.

## II. Findings of Fact

This adversary proceeding came on for trial on October 27, 1999 and proceeded for five days over a period of a week and a half. The court has heard the testimony of the witnesses who testified at trial, considered the testimony of those that appeared through deposition transcript, and evaluated the credibility of all of the witnesses. Insofar as the testimony of any witness conflicts with the findings herein (including findings imposed as discovery sanctions), the court finds that such testimony is not credible.

Vickie filed this bankruptcy case on January 25, 1996, a few months after the decease of her husband J. Howard. His estate remains tied up in a probate proceeding in Texas, where a trial is now in process. It appears that Vickie filed this

## AMENDED MEMORANDUM OF DECISION FOLLOWING TRIAL

SAMUEL L. BUFFORD, Bankruptcy Judge.

## I. Introduction

Debtor Vicki Lynn Marshall, also known as Anna Nicole Smith, is the surviving

---

1. Testimony in a prior trial in an adversary proceeding in this bankruptcy case indicates that there may have been one Texan more wealthy than J. Howard at the time of his death.

2. Because all of the principals in this case have the same last name, the court will refer to them by their first or second names, according to how they are commonly known.

bankruptcy case for two reasons: she had just suffered an $884,607.98 default judgment to her housekeeper Maria Cerrato on sexual misconduct claims,[3] and she had not received any inheritance from J. Howard.

Under her professional name of Anna Nicole Smith, Vickie has pursued an acting and modeling career. She appeared on the cover photo of Playboy Magazine in March, 1992, as the centerfold Playmate of the month in the May, 1992 issue, and as the Playmate of the Year for 1992. She is also known for her television appearances as a model for Guess Jeans. J. Howard promoted and encouraged this career before and during their marriage and paid for acting lessons for her.

After a courtship that lasted some two and a half years, Vickie agreed to marry J. Howard in June, 1994, and they were married immediately. At that time J. Howard was 89 years old, and Vickie was 26. This was the third marriage for J. Howard, and the second for Vickie. J. Howard had two sons from his first marriage, J. Howard Marshall III and Pierce. Vickie had a son from her prior marriage. While a prenuptial agreement was drafted, it was never signed by the parties.

J. Howard's wealth consisted principally in his ownership of approximately 16% of the outstanding shares of stock in Koch Industries, Inc. [hereinafter KII], the second largest privately held corporation in the United States. The Marshall interest in the KII stock was held by Marshall Petroleum, Inc. [hereinafter MPI]. J. Howard's interest in MPI was 70.51776%. The 16% interest in KII is particularly valuable because it was the controlling interest in

3. The sexual harassment case was subsequently settled.

4. After the dust settled in 1981, Charles Kock and David Kock each held 40–41% of the KII stock, J. Howard held 16%, and the remainder was held by employees pursuant to an employee stock option plan.

5. The text in bold print consists in findings that the court makes as sanctions for the discovery violations that are discussed *infra*.

deciding a family dispute in the early 1980's between two factions of the Koch family.[4] Most of the income of KII has been reinvested in the business: typically less than ten percent has been distributed to shareholders.

As an inducement to marry him, J. Howard promised Vickie that he would leave her half of what he had. J. Howard made this promise repeatedly, both before and after the marriage.

In December, 1992 J. Howard instructed Harvey Sorensen, an attorney who represented him from time to time, to arrange a gift to Vickie, "his future wife," of a half interest in his "new community." This gift was to be structured so that the value of the gift was to be measured by J. Howard's interest in the increase in value of the underlying KII stock held by MPI. A few days earlier J. Howard also instructed Jeff Townsend, another attorney who did work for J. Howard, to arrange for Edwin Hunter, a third attorney, to prepare a "catch-all trust" for Vickie's benefit. Neither of these projects was completed **because Pierce fired Sorensen and conspired with Hunter to prevent the drafting and execution of the documents that would have accomplished the gift that J. Howard had directed.**[5]

At the time of trial,[6] J. Howard's interest in the KII stock was worth $1,640,978,-961.[7] From the time that J. Howard and Vickie were married to the date of trial, the value of the stock increased by $449,-754,134.

6. The actual valuation date for the KII stock for the purposes of trial was August 31, 1999.

7. The court assumes that the KII stock is now worth more than $2 billion because the price of oil has increased more than 50% in the last year.

In 1982 J. Howard set up a Living Trust to hold his assets,[8] and eventually transferred the MPI stock into the Trust. J. Howard was the trustee. At the time of Vickie's marriage to J. Howard, Pierce and his family were the sole beneficiaries of the trust: neither Vickie nor J. Howard Marshall III had any beneficial interest in its assets. However, J. Howard had the power to revoke the Trust at any time, in which event the trust assets would revert to J. Howard.

For many years Pierce was fearful that his father J. Howard would give away a substantial part of the wealth that Pierce wanted to inherit. Pierce often argued with J. Howard about money and about J. Howard's gifts to Vickie. Pierce also resented the gifts that J. Howard gave to Lady Walker, his mistress who had died shortly before J. Howard met Vickie, and Pierce brought aggressive litigation against Lady Walker's heirs to challenge their right to what he considered Marshall property. J. Howard did not care about Pierce's views on these subjects.

**As soon as Pierce learned of his father's marriage to Vickie, he contacted attorney Edwin Hunter, to take action to assure that Vickie did not receive any of the assets in the Living Trust. Pierce** was concerned because his father had been especially generous to Lady Walker, his father's mistress for many years who had died in 1990, and he feared that his father would be equally generous to Vickie. In response, Hunter devised a plan to make the trust irrevocable, so that the assets would be protected for Pierce and his family.

The next week Pierce and Hunter met with J. Howard to review a document entitled, "J. Howard Marshall, II Post Nuptial Fine Tuning of Estate Plan" [hereinafter the Fine Tuning Document]. This document contained proposed amendments to the Living Trust.

J. Howard relied on Pierce and Hunter to inform him of the contents of the document. By that time J. Howard's eyesight had deteriorated to the point where he was not able to read any text finer than a newspaper headline.[9] Apparently, J. Howard signed [10] the Fine Tuning Document.[11]

However, the change that made the Living Trust irrevocable was not in the Fine Tuning Document at the time that J. Howard apparently signed it.[12] **Pierce caused this change to be added to page two of the Document at a later date, likely after J. Howard's death.[13]**

8. Exhibit A to the trust instrument is supposed to be a list of assets transferred into the trust. This exhibit has apparently never been produced in this adversary proceeding.

9. However, J. Howard's mental capacities remained intact until his death.

10. The records of Eyvonne Scurlock, the notary who allegedly notarized J. Howard's signature on the Fine Tuning Document, are in shambles and have no credibility. Among other defects, items are out of sequence, key pages are torn out, blank pages are interspersed between those containing notarial records, and she notarized signatures that she did not witness. Indeed, for the first ten years she served as a notary she kept no notarial records at all and did not know that they were required.

11. The court is informed that the authenticity of J. Howard's signature on the trust amend-

ment is at issue in the Texas Probate Court. This issue is left for decision by that court.

12. In addition to what the court finds based on the evidence, the findings in this sentence are also adopted as sanctions for Pierce's discovery violations, as discussed *infra*.

13. After trial, Vickie moved to reopen the record to submit the testimony of Donald J. Fandry, an expert who examined the Fine Tuning Document. The second page of the Document, which contains the provision making the trust irrevocable, is very different from the remaining pages of the document in the following respects: (1) this page alone lacks a watermark; (2) this page is missing a number of the staple holes that appear in the pages before and after, which result from a number of restaplings of the original document; and (3) this page was printed with a different printer from the rest of the document. This page, in its present form, was not part of the original document.

After his father's death, Pierce has continued his plot to prevent Vickie from obtaining any Marshall family assets. Pierce contends that essentially all of J. Howard's assets were in the Living Trust at the time of his death. Pierce stated that, if Vickie tried to get any of the assets, "it would be World War III." Indeed, the court finds that Pierce has adopted a scorched earth approach to the conduct of this litigation and has done his best to make it look like World War III.

### III. Pierce's Discovery Abuses

The court previously found that Pierce engaged in massive discovery abuse in this adversary proceeding in connection with the production of documents properly requested under Rule 7034, which incorporates by reference Rule 34 of the Federal Rules of Civil Procedure.

Pierce's discovery infractions include four kinds of egregious discovery abuse. First, he failed to serve a written response within 30 days after the service of the request, as required by Rule 34(b) and incorporated by reference in FED. R.BANKR.P. 7034.[14] Second, more than a year after the document production request (and after monetary sanctions had been imposed more than once), Pierce provided a privilege log which listed thousands of documents that were not produced based on claims of attorney-client privilege or work product. This privilege log was grossly insufficient for supporting his claim that the documents were not subject to discovery. Third, Pierce disobeyed altogether the court's order to submit these documents for examination in chambers to determine whether the documents qualified for discovery exemption. Fourth, Pierce destroyed a substantial quantity of documents that were subject to a pending discovery request. These egre-

gious discovery abuses require that the court impose appropriate sanctions.[15]

### A. Sending Documents to Attorney

■ Pierce testified that, upon J. Howard's death, he boxed up all of J. Howard's papers and sent them to Edwin Hunter in Lake Charles, Louisiana. These papers fall into two categories: papers belonging to MPI and personal papers that belonged to J. Howard at the time of his death. For both categories, Pierce's obligation to produce the documents is the same as if they were still in his personal possession. As to the documents belonging to MPI, Pierce was the president and sole director of MPI at all material times during this litigation and had the power and responsibility to produce the documents.

As to the personal papers of J. Howard, Pierce was the administrator of J. Howard's probate estate in Louisiana when this adversary proceeding began,[16] when the document production requests were promulgated, when responses thereto came due, and when the documents should have been produced. The Louisiana probate case was ultimately dismissed for lack of jurisdiction and a new probate case was filed in Texas, where a different administrator was appointed. However, Pierce's default occurred during his watch, and his failure to produce the documents cannot be excused by his subsequent replacement by another administrator. Furthermore, the court is informed that Pierce's successor eventually waived any privilege that he had in the documents. Nonetheless, the documents were never produced in this adversary proceeding.

■ It is hornbook law that delivering pre-existing documents to a lawyer does

---

**14.** Pierce also did not serve such a response at any reasonable time thereafter.

**15.** These discovery abuses are not the only ones committed by Pierce, but only the most egregious.

**16.** This adversary proceeding began as a claim that Pierce filed in this bankruptcy case for defamation, and Vickie's counterclaim that is the subject of this decision. Summary judgment was previously awarded to Vickie on the defamation claim, because Pierce offered no evidence to support the claim.

not change a party's obligation to produce them in litigation. McCormick states:

> [T]his principle is controlling: If a document would be subject to an order for production if it were in the hands of the client it will be equally subject to such an order if it is in the hands of his attorney.

McCormick on Evidence 330 (John William Strong, ed., 4th ed.1992); *accord, United States v. Robinson*, 121 F.3d 971, 975 (5th Cir.1997) ("it goes without saying that documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer"); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 356–57 (E.D.Tex.1999). McCormick further states that any other rule "would be an intolerable obstruction to justice." McCormick, *supra*, at 329.

Pierce had full responsibility for the production of all documents in either of these two categories that he sent to Hunter. When Vickie made demand for the production of the documents, Pierce's responsibility was to instruct Hunter to produce the documents for inspection or copying, or to raise any claimed defense to their discovery in a timely filed response. Hunter did neither.[17]

### B. Claiming a Privilege

■ A party claiming a privilege has the burden of showing that the privilege applies. *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir.1997). Federal common law governs the application of a privilege in an adjudication based on federal law. *See* Fed.R.Evid. 501. Where state law provides the applicable substantive law, privilege issues are governed by that state's law. *Id.* In this case, the causes of action at issue are governed by Texas law. Thus Texas law governs the issues of attorney-client privilege and work product.

■ The legal standard for the attorney-client privilege is as follows:

(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by his legal advisor, (8) except the protection be waived.

*See* 8 J. Wigmore, Evidence § 2292 at 554 (J. McNaughton rev.1961); *see also United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir.1982); *Smith v. Texaco, Inc.*, 186 F.R.D. 354, 356 (E.D.Tex.1999).

■ For each document transmitted to a non-attorney, Pierce must show, as to each such recipient, (a) the recipient's name, (b) the position that the recipient held at the time, (c) if the recipient received the document as a corporate official or employee, how the corporation's privilege applied to the recipient. *See Upjohn Co. v. United States*, 449 U.S. 383, 391–96, 101 S.Ct. 677, 683–86, 66 L.Ed.2d 584 (1981).

■ Pierce has not made an adequate showing on any of these issues, as to any of the documents at issue. While the names of some of the authors and recipients are given, none is identified as an attorney. The positions of the non-attorneys at the relevant times are not given, nor is any explanation given of how they qualify under *Upjohn*.

The court has serious reservations about the legitimacy of the attorney-client privilege and work product claims. Pierce did deliver more than 100 documents for *in camera* inspection that were in the possession of Jeff Townsend. The court found that approximately 13 of the documents were subject to a legitimate claim of attorney-client privilege or work product. For most of the remaining documents, the court found no good faith contention that either exception applied. The non-qualify-

---

17. If, after receiving such instructions, Hunter failed or refused to produce the documents, Pierce's remedy is against Hunter for violation of Hunter's duty as Pierce's agent to obey his lawful orders.

ing documents included such items as transmittal letters, annual statements of KII, a videotape of J. Howard's arrival at Vickie's home to visit her after their marriage, and photographs of Vickie taken on vacation after J. Howard's death. The court infers from this evidence that most of the attorney-client privilege and work product claims for the Hunter documents are equally meritless.[18]

Because Pierce failed to carry the burden of showing the applicability of either the attorney-client privilege or the attorney work product doctrine, all of the documents on the privilege log should have been produced to Vickie in this litigation. They were not. The court concludes and finds that all of the privilege and work product claims relating to the Hunter documents were also specious and made in bad faith.

## C. Sanctions for Discovery Violations

The court issued its findings and sanctions order on the discovery violations on May 20, 1999.[19] The court subsequently vacated that order. Meanwhile, Pierce has done nothing to vitiate his refusal to produce the documents at issue for an *in camera* inspection.

The findings of fact and conclusions of law highlighted in bold in this opinion or otherwise specified are imposed as sanctions for Pierce's discovery abuse. The court finds that many documents listed in the privilege log directly relate to the transactions as to which the sanctions are imposed. Furthermore, there is no way to

know what was in the documents that Pierce destroyed while they were subject to a discovery request.

■ In addition, Edwin Hunter testified at the trial over Vickie's objections based on Hunter's failure to produce the Hunter documents or to submit them to the court for *in camera* inspection. The court now sustains those objections, and strikes Hunter's testimony.

## IV. Tortious Interference with Expectancy of Inheritance or Gift

■ Texas law clearly recognizes tortious interference with an inheritance or gift as a valid cause of action. The leading Texas case is *King v. Acker*, 725 S.W.2d 750, 754 (Tex.App.1987); *see also Brandes v. Rice Trust, Inc.*, 966 S.W.2d 144, 146–47 (Tex.App.1998). In *King* the court sustained a claim for tortious interference with an expected inheritance in an action brought against the decedent's second wife by the decedent's two children from his first marriage. The court found that the second wife improperly attempted to assign 500 shares of stock to herself from the decedent while he was in a coma, pursuant to a power of attorney that the jury found the decedent had not signed.

*King* was the first published opinion declaring that Texas law recognizes a cause of action for tortious interference with inheritance rights. Following courts from

---

18. If Ninth Circuit law had governed the procedures relating to the testing of the assertion of attorney-client privilege and work product, that law would require the party opposing the privilege claim to show a factual basis sufficient to support a reasonable, good faith belief that *in camera* inspection may reveal evidence that information in the materials is not privileged. *See In re Grand Jury Investigation*, 974 F.2d 1068, 1074–75 (9th Cir.1992); *see also United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 2631, 105 L.Ed.2d 469 (1989) (for determination of crime-fraud exception to attorney-client privilege, once threshold showing is made, court has discretion to conduct *in camera* review based on all

the facts and circumstances of the case, including the relative importance to the case of the alleged privileged information, the likelihood that the evidence produced through *in camera* review (together with the other evidence in the case) will establish that the exception applies). The experience with the Townsend documents fully satisfies these requirements.

19. The court issued a prior set of findings and sanctions on January 21, 1999, which were vacated by the district court and remanded for more specific findings.

other states, the court relied on the Restatement formulation of the rule, which states:

> One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift.

RESTATEMENT (SECOND) OF TORTS § 774B (1977). The court further supported its conclusion by stating:

> It is well understood that the law affords a remedy for every invasion of a legal right. Under the maxim "where there is a right, there is a remedy," equity will not suffer a right to be without a remedy.

*King*, 725 S.W.2d at 754. On these grounds the court upheld an award of both compensatory and punitive damages against the decedent's second wife for using the forged power of attorney to transfer stock from the decedent to herself while he was unconscious.

In *Brandes* the decedent's sister and her children brought an action against Rice University for tortiously interfering with their expectancy to inherit some $4 million in municipal bonds that the decedent transferred to the university on his deathbed. The court ruled for the university because the decedent's will would not have left the bonds to the plaintiffs if the transfer to the university had not been made. *Brandes*, 966 S.W.2d at 149.

 Texas case law does not specify the elements of a cause of action for tortious interference with an expectancy of inheritance or gift. Other jurisdictions, however, have generally held that a plaintiff must prove the following five elements: (1) the existence of an expectancy; (2) a reasonable certainty that the expectancy would have been realized, but for the interference; (3) intentional interference with that expectancy; (4) tortious conduct involved with the interference; and (5) damages. *See, e.g., Doughty v. Morris*, 117

N.M. 284, 871 P.2d 380, 384 (Ct.App.1994); *see also* James A. Fassold, *Tortious Interference with Expectancy of Inheritance: New Tort, New Traps*, ARIZ. ATT'Y, 26, 27 (Jan.2000); Dennis D. Reaves, *Tortious Interference with an Expected Gift or Inheritance*, J.Mo.B. 563, 564 (1991).

### A. Existence of an Expectancy

The court finds that Vickie had an expectancy to receive a substantial portion of J. Howard's wealth. J. Howard repeatedly told her that she would receive half of what he owned. While J. Howard never made a will with any provision for her, this was because his principal assets were already in the Living Trust. J. Howard's plan was to provide for Vickie from the Living Trust.

In December, 1992 J. Howard instructed both Sorensen and Hunter to arrange a gift to Vickie from the Trust. J. Howard instructed Hunter, a tax and estate planning expert, to prepare a "catch-all trust" for Vickie. A few days later J. Howard instructed Sorensen to prepare the documents for a gift to Vickie of one-half of the future appreciation in J. Howard's interest in the MPI stock. No evidence has been offered that these instructions were ever rescinded.

### B. Reasonable Certainty of Expectancy But For Defendant's Conduct

Vickie must show with a reasonable degree of certainty that she would have received the expectancy but for Pierce's interference. Comment d to § 774B states in relevant part:

> [T]here must be proof amounting to a reasonable degree of certainty that the bequest or devise would have been in effect at the time of the death of the testator or that the gift would have been made inter vivos if there had been no such interference.... Complete certainty is [often] impossible. It is not required.... The fact that it was the defendant's tortious act that makes it not

possible to prove with certainty may be taken into consideration by the court. RESTATEMENT, *supra,* cmt. d.

No evidence has been presented on why J. Howard's instructions to Sorensen and Hunter were not followed. The court assumes that the answers to this question lie in the documents that Pierce has destroyed or refused to produce. **The court finds that the gift to provide for Vickie did not take place because Pierce fired Sorensen and conspired with Hunter to prevent the drafting and execution of the documents that would have accomplished the gift that J. Howard directed.**

Thus Vickie has adequately shown the reasonable certainty that she would have received a substantial gift from J. Howard, in the amount that the court hereafter awards as damages.

### C. Intentional Conduct

Tortious interference with an expectancy is an intentional tort. A plaintiff must show an intentional invasion or destruction of plaintiff's prospective interest or expectancy of which the defendant had actual knowledge. Reaves, *supra,* at 564. The proof must show that the defendant was aware of his or her interference and in fact intended to interfere with the expectancy. Marilyn Marmai, Note, *Tortious Interference With Inheritance: Primary Remedy or Last Recourse,* 5 Conn. Prob.L.J. 295, 301 (1991).

**When Pierce learned of J. Howard's directions to arrange a trust for Vickie in December 1992, he took action with Hunter to prevent the formation of the trust and the transfer of assets from the Living Trust for Vickie's benefit. Furthermore, in July 1994, upon learning of his father's marriage to Vickie, Pierce acted to assure that the marriage did not interfere with his own expectation that he and his family would inherit all of his father's wealth.** There is no doubt that this conduct was intentional and specifically intended to prevent Vickie from obtaining any of the Marshall interest in MPI and KII.

Hunter, **acting on Pierce's instructions,** failed to prepare the catch-all trust.

In addition, in 1994, **again acting on Pierce's instructions,** Hunter devised a plan to make the Living Trust irrevocable and prepared the Fine Tuning Document to permit this to take place. After J. Howard apparently signed the Fine Tuning Document, Pierce caused the Document to be altered to substitute the page that made the Living Trust irrevocable. Whether in fact the Fine Tuning Document is genuine and effective to carry out this purpose will be decided by the Probate Court in Texas.

### D. Independently Tortious Conduct

The most important element of tortious interference with the expectancy of an inheritance is that the defendant's conduct must be tortious. Typical examples of this tort occur where a testator has been induced to make or not to make a bequest by fraud, duress, defamation or tortious abuse of fiduciary duty, or the tortfeasor has forged, altered or suppressed a will (or a document making a gift). RESTATEMENT § 774B, *supra,* cmt. c; *see also* Fassold, *supra,* at 27. In contrast, persuading a testator to eliminate an expectancy through legitimate means is not enough to satisfy this element. *See* Reaves, *supra,* at 564.

Pierce's tortious conduct in this case came in two phases. **First, at the end of 1992 and in early 1993 he fired Sorensen for the purpose of preventing him from arranging the gift to Vickie of the increase in value of the MPI stock, and he conspired with Hunter to prevent the preparation of the catch-all trust.** Second, he caused the altering of the Fine Tuning Document, by substituting a new second page of the document after its apparent execution to insert a provision that purported to make the Living Trust irrevocable. This independently tortious conduct supports Vickie's claim for tortious interference with her expectancy of an inheritance from her deceased husband J. Howard.

### E. Damages

Vickie offers three different measures of damages for Pierce's wrongful conduct. First, she contends that the court should award damages that equal half of everything in which J. Howard had an interest. According to Vickie's expert Wayne Elggren,[20] half of J. Howard's interest in MPI, as of August 31, 1999 (immediately before the trial in this adversary proceeding), was worth $820,489,480. This amount would give effect to J. Howard's repeated promise that she would get half of what he had.

As a second possible measure of damages, Elggren testified that J. Howard's share of the appreciation in the KII stock from December 23, 1992 to August 31, 1999 was $556,874,869. This sum would give effect to J. Howard's instructions to Sorensen on or about that date to arrange a structure to give Vickie the appreciation in value of J. Howard's interest in the KII stock.

Elggren presented a third possible measure of damages, the increase in value of the MPI stock from June 27, 1994, the date of Vickie and J. Howard's marriage, to August 31, 1999. Elggren testified that the J. Howard's interest in the MPI stock increased during this period from $741,470,693 to $1,640,978,961, an increase of $899,508,268. Vickie's half share of this sum would be $449,754,134.

Pierce's expert Mike Hill opined that the community property value of the KII stock was $170 million. **The court denied the admission of Hill's testimony as sanctions for Pierce's discovery violations, as discussed *supra* and as provided in the court's order of May 21, 1999.**

■ The court finds the most appropriate measure of Vickie's damages from Pierce's tortious interference with her expectancy of a gift from J. Howard to be the lowest of these figures, $449,754,134. While J. Howard gave the instructions to make the gift in 1992, the court finds that J. Howard gave this direction in contemplation that Vickie would marry him. In fact she did, but not until 1994. The court finds it equitable to measure her damages from the date of their marriage.

■ Vickie has actually been damaged only to the extent that she does not receive a share of the probate estate in Texas. The probate action is in trial now, and the amount that Vickie receives in that proceeding must be deducted to determine the damages that Pierce has caused.

### F. Punitive Damages

■ Under Texas law, damages available for the tortious interference with an expectancy of an inheritance or gift may include consequential damages, emotional distress or actual harm to reputation, and punitive damages. *See King*, 725 S.W.2d at 754; *see also* Fassold, *supra*, at 29; Reaves, *supra*, at 565. Vickie has not shown any consequential damages, emotional distress or harm to reputation. However, she does claim punitive damages against Pierce.

■ It appears to the court that, under Texas law, this is an appropriate case for the assessment of punitive damages. However, the determination of the amount of punitive damages must await the calculation of the compensatory damages. This calculation, in turn, must await the determination of the amount, if any, that Vickie receives from J. Howard's estate.

### V. Conclusion

The court concludes that Vickie has shown, by a preponderance of the evidence admitted at trial and the findings imposed as sanctions against Pierce for discovery abuses, that Pierce has tortiously deprived her of her expectancy of a substantial *inter vivos* gift from her deceased husband J. Howard.

The court awards damages in the amount of $449,754,134, less any amount

---

20. The court finds all of Elggren's testimony on this subject to be credible.

that Vickie actually recovers in the pending Probate Court action in Texas. In addition, Vickie is entitled to punitive damages in an amount that remains to be determined after her actual damages are calculated.