In re Vickie Lynn **MARSHALL,**
Debtor.

E. Pierce Marshall, Appellant,

v.

Vickie Lynn Marshall, Appellee.

Vickie Lynn Marshall, Cross–Appellant,

v.

E. Pierce Marshall, Cross–Appellee.

No. SA CV 01–97 DOC.
Bankruptcy No. LA–12510 SB.
Adversary No. 96–1838 SB.

United States District Court,
C.D. California.

June 19, 2001.

**614**

Robert E. Mangels, Joseph A. Eisenberg, Herbert A. Bernhard, Julia J. Rider, Jeffer, Mangels, Butler & Marmaro, Los Angeles, CA, G. Eric Brunstad, Jr. Bingham Dana, Hartford, CT, for E. Pierce Marshall.

Rex S. Heinke, Sheila S. Kato, Jessica M. Weisel, Jennifer C. Yang, Greines, Martin, Stein & Richard, Beverly Hills, CA, Philip W. Boesch, Jr., Boesch Law Group, Marina Del Rey, CA, for Vickie Lynn Marshall.

## AMENDED *ORDER* REGARDING SUBJECT MATTER JURISDICTION AND WHETHER THE TORTIOUS INTERFERENCE COUNTERCLAIM IS CORE OR NON-CORE

CARTER, District Judge.

In this appeal from the bankruptcy court, a litigant who filed a proof of claim and an adversary complaint to determine the dischargeability of a debt allegedly owed to him by the debtor challenges a judgment entered against him on a counterclaim brought by the debtor. The debtor also cross-appeals. For the convenience of the Court and the parties, the Court instructed the parties initially to brief only two threshold issues. These issues are whether federal courts lack jurisdiction over this matter because of the probate exception to federal jurisdiction and whether the counterclaim is a core or non-core matter.[1] The bankruptcy court below held that the probate exception does not bar jurisdiction in this case and that the proceeding is a core matter. For the reasons that follow, the Court agrees that federal courts may exercise jurisdiction over this matter, but reverses the bankruptcy court's determination that this is a core matter.

### I.

### BACKGROUND

Appellee and Cross–Appellant Vickie

---

1. The Court heard oral argument on these issues on May 7, 2001.

Lynn Marshall ("Vickie")[2] is the surviving widow of J. Howard Marshall II ("J. Howard, Sr."), who died on August 4, 1995. Vickie and J. Howard, Sr. were married on June 27, 1994, after two and a half years of courtship. At the time of their marriage, Vickie was 26 years old and J. Howard, Sr. was 89 years old. Vickie, also known as Anna Nicole Smith, is a figure of some notoriety because of her career as a model. Prior to their marriage, J. Howard, Sr. had assisted in developing her career. J. Howard, Sr. is also a figure of some notoriety in his own right, as he was said to be either the richest or second-richest man in Texas at the time of his death. His wealth was held in several different ways, including a living trust, and the exact amount and location of his wealth at the time of his death appears to be disputed. It seems clear that he was worth at least $1.6 billion.

It is undisputed that J. Howard, Sr. lavished great sums of money on Vickie during their courtship and marriage. Nonetheless, he did not explicitly provide for Vickie in his will. However, according to Vickie, and as found by the bankruptcy court, J. Howard, Sr. promised Vickie that she would receive substantial wealth and be taken care of. J. Howard, Sr.'s sons from two former marriages, J. Howard Marshall III ("J. Howard, Jr.") and Appellant and Cross–Appellee E. Pierce Marshall ("Pierce"), contest whether J. Howard, Sr. ever made such promises.

The magnitude of the sums of money involved in J. Howard, Sr.'s estate has sparked intensely contested litigation on several fronts. First, some probate proceedings took place in Louisiana, but were dismissed some time ago. Second, the estate is currently going through probate in Texas. Trial in the probate proceedings has concluded, and the jury has returned a verdict, but apparently judgment has not yet been entered. Third, on January 25, 1996, a few months after J. Howard, Sr.'s death, Vickie filed for Chapter 11 bankruptcy here in the Central District of California.[3] This bankruptcy case engendered two adversary proceedings with which this Court has had involvement. This Order refers to these two adversary proceedings as the "Hilliard adversary proceeding" and the "Pierce adversary proceeding."

The Hilliard adversary proceeding began in January 1998 when Vickie filed an adversary complaint against Finley Hilliard as trustee of the J. Howard Marshall Living Trust and as executor of the succession of J. Howard Marshall II, et al. On July 22, 1998, the Honorable William D. Keller issued an order withdrawing the reference to the bankruptcy court of this proceeding, which thereafter proceeded before Judge Keller. On March 10, 1999, Judge Keller stayed the proceeding, pending the outcome of either the Texas probate proceedings or the Pierce adversary proceeding.[4] On November 8, 1999, the proceeding was transferred to this Court.[5] The proceeding remains stayed.

**2.** As all the principals in the matters at hand share the same last name, the Court will refer to the parties by their given names, as is customary in cases involving family members.

**3.** The bankruptcy court noted in one of its decisions that Vickie apparently filed for bankruptcy because, after not receiving an inheritance from J. Howard, Sr., she lacked money and also because a default judgment had been entered against her on claims brought by her former personal assistant or

housekeeper. This claim subsequently settled.

**4.** Judge Keller made this ruling in an order entered in case number CV 98–7686 WDK, which was the case number assigned to Pierce's original motion to withdraw the reference of the Pierce adversary proceeding.

**5.** When it began its existence as an adversary proceeding in the bankruptcy court, the Hilliard adversary proceeding had adversary num-

The appeal currently before the Court concerns the Pierce adversary proceeding. This proceeding began in 1996, a couple of years prior to the instigation of the Hilliard adversary proceeding. On May 7, 1996, Pierce filed an adversary complaint seeking a determination that Vickie owed him a debt that was nondischargeable. Pierce alleged that Vickie had defamed him when, prior to the time she filed for bankruptcy and with her complicity, some of her lawyers told members of the press that Pierce had used forgery, fraud, and overreaching to gain control of Howard's assets.[6] On June 11, 1996, Pierce filed a proof of claim in the bankruptcy case. He made the claim by attaching a copy of the complaint from his adversary proceeding.

Vickie responded to both the adversary complaint and the proof of claim. As to the adversary proceeding, on June 14, 1996 she answered, in part asserting truth as a defense. She also asserted counterclaims for fraudulent transfer, an injunction, conversion, tortious interference with inheritance, breach of fiduciary duty, abuse of process, fraud, promissory estoppel, breach of contract (third-party beneficiary), the imposition of a constructive trust, an accounting, and indemnity and contribution. As to Pierce's proof of claim, Vickie filed an objection on July 3, 1996.

On September 22, 1998, Pierce filed a motion to withdraw the reference for his adversary proceeding. This motion was assigned to Judge Keller for determination. Judge Keller issued a ruling on October 21, 1998, but he then vacated that order and issued a new ruling on March 10, 1999. The March 10, 1999 ruling denied Pierce's request to withdraw the reference. The effect of this ruling was that the Pierce adversary proceeding remained in the bankruptcy court in its entirety.[7]

On November 5, 1999, the bankruptcy court granted summary judgment for Vickie on Pierce's claim. It found that Vickie had published no statements about Pierce, had not ratified any statements about Pierce made by her attorneys, and was not otherwise vicariously liable for any statements her attorneys had made about Pierce. Thus, it held that Vickie had not committed a willful or malicious act under 11 U.S.C. § 523(a)(6).

Vickie's counterclaims against Pierce went to trial in the bankruptcy court in the fall of 1999. Approximately ten months later, on September 27, 2000, the bankruptcy court issued a Memorandum of Decision Following Trial ("Original Decision"). The Original Decision held that Pierce tortiously interfered with Vickie's expectation of the inheritance she otherwise could have received through a widow's election. On October 6, 2000, the bankruptcy court issued an Amended Memorandum of Decision Following Trial

---

ber AD 98–1159 SB. After the reference was withdrawn but while the Hilliard adversary proceeding was still before Judge Keller, the proceeding had case number CV 98–4398 WDK. After being transferred to this Court, the Hilliard adversary proceeding was assigned case number SA CV 99–1372 DOC. This is the current, operative number for the Hilliard adversary proceeding.

6. Debts based on "willful and malicious injury," such as intentional torts, are not dischargeable. 11 U.S.C. § 523(a)(6). Damages for libel or defamation are not dischargeable

when the statements were published with knowledge of their falsity. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986).

7. Judge Keller's March 10, 1999 order refers the Pierce adversary proceeding in its entirety back to the bankruptcy court. Specifically, the order states without limitation, "This Court's October 21, 1998 Order is vacated. Accordingly, Case No. CV 98–7686, *In re Vickie Lynn Marshall*, is referred back to the Bankruptcy Court."

("Amended Decision"), which supercedes the Original Decision. *See In re Vickie Lynn Marshall,* 253 B.R. 550 (Bankr. C.D.Cal.2000). Based on the evidence at trial and in large part on facts found against Pierce as sanctions for his discovery abuses, the Amended Decision concludes not that Pierce tortiously interfered with Vickie's expectation of an inheritance, but that he interfered with her expectation of an *inter vivos* gift. Specifically, the Amended Decision states:

> The court finds that Vickie had an expectancy to receive a substantial portion of J. Howard's wealth. J. Howard repeatedly told her that she would receive half of what he owned. While J. Howard never made a will with any provision for her, this was because his principal assets were already in the Living Trust. J. Howard's plan was to provide for Vickie from the Living Trust.

> In December, 1992 J. Howard instructed both Sorensen and Hunter to arrange a gift to Vickie from the Trust. J. Howard instructed Hunter, a tax and estate planning expert, to prepare a "catch-all trust" for Vickie. A few days later J. Howard instructed Sorensen to prepare the documents for a gift to Vickie of one-half of the future appreciation in J. Howard's interest in MPI stock.[8] No evidence has been offered that these instructions were ever rescinded.

Am. Decision at 7. After discussing the certainty of the gift and Pierce's tortious conduct to prevent it, the Amended Decision then concludes:

> Pierce has tortiously deprived [Vickie] of her expectancy of a substantial *inter vivos* gift from her deceased husband J. Howard.

> The court awards damages in the amount of $449,754,134, less any amount that Vickie actually recovers in the pending Probate Court action in Texas. In addition, Vickie is entitled to punitive damages in an amount that remains to be determined after her actual damages are calculated.

Am. Decision at 9.

Pierce then filed a motion to withdraw the reference, assigned to this Court for determination. Just prior to argument on that motion, the bankruptcy court issued a third order on November 21, 2000. This decision, the Supplemental Memorandum of Decision Following Trial ("Supplemental Decision"), does not supercede the Amended Decision, but instead supplements it by explaining that the bankruptcy court had determined that Vickie's counterclaims were core proceedings and by imposing punitive damages of $25 million. It requested further briefing regarding certain forms of injunctive relief requested by Vickie, discussed requests by the parties for revisions to its findings of fact and conclusions of law, and set a hearing for December 6, 2000.

This Court heard oral argument on Pierce's motion to withdraw the reference on December 11, 2000 and then took the matter under submission. It then requested further briefing regarding the jurisdictional issue raised by Pierce in his motion.

On December 29, 2000, the bankruptcy court issued an Order on Motion for Entry of Judgment ("Order Re Judgment"). In this order, the bankruptcy court addressed Pierce's contention that the probate exception bars federal jurisdiction over Vickie's

---

**8.** MPI, or Marshall Petroleum, Inc., is a privately held corporation that in turn owns stock in Koch Industries, Inc., an oil and gas corporation affiliated with the Marshall family.

counterclaim. The bankruptcy court rejected this contention. It held that Pierce had waived any objections to jurisdiction and had consented to jurisdiction by filing a proof of claim. Further, it held that in any event, the counterclaim did not fall within the exception, assuming the exception applies to bankruptcy cases. The bankruptcy court also provided further explanation as to why it had determined the matter is a core bankruptcy matter. Finally, the bankruptcy court ruled that it was appropriate to enter final judgment. The bankruptcy court entered a final judgment that day. This appeal followed.

Before considering the appeal, this Court denied as moot Pierce's motion to withdraw the reference, in addition to several motions for leave to file interlocutory appeals filed by Pierce.

## II.

### JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1), because the bankruptcy court has entered a final judgment in this adversary proceeding.

■■■ The Court reviews the bankruptcy court's legal conclusions *de novo*. Both subject matter jurisdiction and whether a proceeding is core or non-core are legal

questions over which the Court exercises *de novo* review. *In re Castlerock Properties*, 781 F.2d 159, 161 (9th Cir.1986) (exercising *de novo* review over jurisdiction question, including core or non-core classification).[9]

■■■ If the Court determines that this is a core matter, it will then review the rest of the bankruptcy court's decision for abuse of discretion. If the Court determines that this is a non-core matter, it will review all aspects of the bankruptcy court's decision, including its factual findings, *de novo*. In non-core matters, the bankruptcy court cannot enter final judgment, and thus if this matter is non-core, the bankruptcy court's decision will be treated as proposed, rather than final.

## III.

### DISCUSSION

Two issues are presented on this first phase of the appeal. First, whether the probate exception to federal subject matter jurisdiction applies to bankruptcy proceedings and if so, whether this matter falls within that exception. Second, whether this matter constitutes a core or non-core matter.

In resolving these issues, the Court need consider only the counterclaim actually decided, tortious interference with the expectation of an *inter vivos* gift,[10] rather than

---

9. Vickie notes that a treatise submitted by Pierce as an exhibit states that unless the district court, on a motion to withdraw the reference, makes the determination that a proceeding is core or non-core, the bankruptcy court's determination "will be binding, subject only to conventional appellate review (if permission for interlocutory review is granted under § 158(a)) under the 'clearly erroneous' standard." 1 *Norton Bankruptcy Law and Practice* 2d § 4.26, at 461. This passage is somewhat opaque, is not supported by any citations in the treatise, and is contra-

dicted by the sentence immediately preceding it in the treatise, which states, "The ultimate determination that a proceeding is core is reviewed *de novo*, like other jurisdictional findings." *Id.* at 460. The Court will follow the Ninth Circuit's approach and review the core or non-core determination *de novo*.

10. While this counterclaim is titled "Tortious Interference With Inheritance," in the body of the counterclaim it alleges interference with expectancies of "inheritance and/or gift." As indicated, the final decision of the bankruptcy court concerned interference with Vickie's ex-

all of Vickie's counterclaims. The bankruptcy court issued no ruling in favor of Vickie on any of her other counterclaims, and thus they are not before the Court on this appeal.[11] The theory of the *inter vivos* gift counterclaim is that J. Howard, Sr. placed most of his assets in a living trust prior to his death and that he intended to set up, prior to his death, a structure whereby Vickie would be provided for out of that living trust.

## A. Probate Exception

■ Initially, the Court rejects two of Vickie's arguments. First, Pierce has not waived his objection to federal subject matter jurisdiction. While it may be true that it is disfavored for a party to wait until it has lost a case and then assert a lack of subject matter jurisdiction, lack of subject matter jurisdiction is in general a non-waivable defect. Further, while the motion Pierce attempted to bring regarding subject matter jurisdiction was properly rejected by the bankruptcy court for being untimely filed, his answer to Vickie's counterclaim does attack the court's jurisdiction. That the answer does not explicitly use the words "probate exception" is not material, as his answer was sufficient to alert the court and the parties to the fact that he challenged the court's jurisdiction.

■ Second, the Court rejects the idea that Pierce "consented" to jurisdiction by filing a proof of claim. The notion of jurisdiction by consent, sometimes referred to as jurisdiction "by ambush," was used in bankruptcy law in the past, but the Supreme Court's ruling in *Northern Pipeline Construction Co. v. Marathon Pipe*

*Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) seems to contradict it. In addition, in so far as the issue is the actual subject matter jurisdiction of the federal courts, rather than just the bankruptcy court's power to enter a final judgment, such jurisdiction cannot be conferred by consent.

However, considering Pierce's jurisdictional objection on the merits, the Court rejects his position and concludes that federal courts, including both this Court and the bankruptcy court, may properly exercise jurisdiction over this matter.

It is commonly understood that the "probate exception" bars federal courts from probating a will. While at first glance this proposition may seem unremarkable, both the origin and scope of the exception are not entirely clear. As the Seventh Circuit has noted, "The probate exception is one of the most mysterious and esoteric branches of the law of federal jurisdiction." *Dragan v. Miller,* 679 F.2d 712, 713 (7th Cir.1982). In particular, the origins of the exception are rather murky. A historical explanation, involving the exclusive jurisdiction of the ecclesiastical courts in England at the time the Judiciary Act of 1789 was passed, is frequently proffered. *E.g., Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 298, 90 L.Ed. 256 (1946). However, there are potential problems with this explanation. *See Dragan,* 679 F.2d at 713 (describing the historical explanation as "shoddy"). Further, the historical explanation does not offer a compelling reason or rationale for why the exception should be continued today.

pectancy of a gift from J. Howard, Sr. before his death.

11. Apparently, at the beginning of the trial in the bankruptcy court, Vickie's attorney stated, "[I]n effect what we're seeking is interference

with an inter-vivos gift, we're not seeking interference with inheritance rights because there were no assets left at the time that [J. Howard, Sr.] passed." Vickie's Appendix at 139:2–6.

Other possible explanations include the idea that probating a will is not a "case or controversy" within the meaning of Article III, or that the Tenth Amendment reserves probate matters to the states. *See Rice v. Rice Found.*, 610 F.2d 471, 475 n. 6 (7th Cir.1979) (Article III); *McCan v. First Nat'l Bank of Portland*, 139 F.Supp. 224, 228 (D.Or.1954) (Tenth Amendment), *aff'd*, 229 F.2d 859 (9th Cir.1956). These rationales may be more satisfying than the historical explanation as justifications for the probate exception today. However, the Supreme Court has never formally adopted one of these rationales. Also, these rationales conflict with authority that states that the doctrine is "judicially created." *E.g., Rice*, 610 F.2d at 474. If the doctrine stems from the Constitution itself, it is not judicially created.

It is also possible that while not being constitutionally compelled, the doctrine is a result of the principles of comity attendant to our federal system.

The lack of clarity surrounding the origin of the exception makes it difficult to resolve the threshold issue argued by the parties, which is whether the probate exception applies only to diversity jurisdiction or to all federal jurisdiction, including bankruptcy. As Vickie notes, nearly all of the cases applying or analyzing the probate exception arise under diversity jurisdiction. However, this fact alone does not resolve the question, because there are few non-diversity actions in which the issue could even arise. If the exception stems from a historical practice embodied in the diversity jurisdiction statute, it perhaps would apply only to diversity jurisdiction. Similarly, if the exception is just a judicially created doctrine recognizing that the federal interests present in diversity cases are sometimes overshadowed by stronger state interests, it might not apply to cases in which the courts' subject matter juris-

diction derives from federal law, such as bankruptcy law. However, if the exception stems from Article III or the Tenth Amendment, it presumably would apply to any proceeding in federal court, regardless of the basis of the court's subject matter jurisdiction. *Cf. Sutton v. English*, 246 U.S. 199, 205, 38 S.Ct. 254, 256, 62 L.Ed. 664 (1918) ("[A]s the authority to make wills is derived from the states, and the requirement of probate is but a regulation to make a will effective, matters of strict probate are not within the jurisdiction of courts of the United States.").

Whatever the origin of the exception, the practical and structural considerations attendant to it in the diversity context seem equally likely to arise for any action in federal court, including bankruptcy matters. The legal certainty that is of extra importance when dealing with matters of inheritance, the specialized nature of probate law and the corresponding expertise of probate court, the idea that normally probate matters are of local concern only, and the judicial economy that stem from limiting litigation involving one decedent's estate to one forum, particularly the forum that has asserted *in rem* jurisdiction over the physical property of the decedent's estate, all are still of concern when dealing with bases of federal jurisdiction other than diversity.

Thus, it is the Court's opinion that the exception most likely applies to all matters in federal court, not just those premised on diversity jurisdiction. However, the Court need not formally decide this issue, because even assuming the probate exception applies to this case, the counterclaim decided by the bankruptcy court does not fall within the exception.

 In the leading Supreme Court case on the scope of the probate exception, the Court explained:

It is true that a federal court has no jurisdiction to probate a will or administer an estate.... But it has been established by a long series of decisions of this Court that federal courts of equity have jurisdiction to entertain suits in favor of creditors, legatees and heirs and other claimants against a decedent's estate to establish their claims so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.

*Markham*, 326 U.S. at 494, 66 S.Ct. at 298; *see also Sutton*, 246 U.S. at 205, 38 S.Ct. at 256 (stating that suits that can "be determined without interfering with probate or assuming general administration, are within the jurisdiction of the federal courts").

 Here, the bankruptcy court did not assert jurisdiction generally over the probate proceedings for J. Howard, Sr. or take control over his estate's assets, which are a part of the *in rem* jurisdiction of the Texas court administering his probate proceedings. Thus, the probate exception would bar federal jurisdiction over Vickie's counterclaim only if such jurisdiction would "interfere" with the probate proceedings. *Markham*, 326 U.S. at 494, 66 S.Ct. at 298.

Pierce argues that the counterclaim interferes with the Texas probate proceeding because the issues addressed are similar or related. However, courts hold that a matter must be more than merely related to a probate proceeding to fall within the exception and hence not be within the power of a federal court. The Seventh Circuit has grouped federal courts' decisions regarding the probate exception into two categories. *See Rice*, 610 F.2d at 476. In the first of these categories, the test used is whether the claim rests on an assertion that the will is invalid. *Id.* In the second, the test used is whether under the law of the state administering the probate, the claim could be brought only in the probate court, as opposed to a state court of general jurisdiction. *Id.* The tests are not entirely distinct from each other and courts do not always identify if they are applying one or the other. In substance, both tests are frameworks for analyzing and answering the overarching question, which is whether the assumption of federal jurisdiction will interfere with state probate proceedings. The Ninth Circuit has never explicitly adopted either test.

Under the first test, Vickie's counterclaim for interference with her expectation of an *inter vivos* gift does not fall within the exception. It is uncontested that the counterclaim does not rest on an assertion that J. Howard, Sr.'s will is invalid. On the counterclaim, Vickie makes no assertion regarding the validity of J. Howard, Sr.'s will, which left nothing to her. Whether Pierce interfered with J. Howard, Sr.'s plans to make a gift to Vickie through a trust arrangement is a determination that can be made completely independently from a determination of whether or not J. Howard, Sr.'s will is valid.

Also under the second test, Vickie's counterclaim does not fall within the exception. On the counterclaim, the bankruptcy court found that J. Howard, Sr. intended to give Vickie a gift before he died:[12]

---

12. The bankruptcy court's factual findings include findings imposed as sanctions for Pierce's discovery abuses. Whether or not these sanctions were warranted and whether or not the bankruptcy court's factual findings were correct are issues that are not before the Court on this phase of this appeal. The Court here considers the findings of the bankruptcy court only as part of its analysis of the nature of Vickie's counterclaim.

In December, 1992 J. Howard instructed both Sorensen and Hunter to arrange a gift to Vickie from the Trust. J. Howard instructed Hunter, a tax and estate planning expert, to prepare a "catch-all trust" for Vickie. A few days later J. Howard instructed Sorensen to prepare the documents for a gift to Vickie of one-half of the future appreciation in J. Howard's interest in the MPI stock.

Am. Decision at 7. The bankruptcy court further found that Pierce interfered with J. Howard, Sr.'s plans:

[Pierce] fired Sorensen for the purpose of preventing him from arranging the gift to Vickie of the increase in value of the MPI stock, and he conspired with Hunter to prevent the preparation of the catch-all trust. . . . [H]e caused the altering of [a document created regarding J. Howard, Sr.'s living trust, of which Pierce and his family were the sole beneficiaries] by substituting a new second page of the document after its apparent execution to insert a provision that purported to make the Living Trust irrevocable.

Am. Decision at 8.

Texas law does not require that this counterclaim be asserted in the probate court. Under the Texas Probate Code, a court exercising original probate jurisdiction has exclusive jurisdiction over "applications, petitions and motions regarding probate and administrations." Tex. Prob. Code Ann. § 5(c) (Vernon 1980). Pierce makes no argument that Vickie's counterclaim falls within this provision. Over other matters, probate courts and Texas courts of general jurisdiction, which in Texas are called district courts,[13] have concurrent jurisdiction. For example, probate courts and district courts have con-

current jurisdiction over "actions involving an *inter vivos* trust." Tex. Prob.Code Ann. §§ 5(d), 5A(c)(2) (Vernon 1980). However, there is a further provision regarding matters, such as Vickie's counterclaim, that are within the concurrent jurisdiction of both the probate and district courts. "In situations where the jurisdiction of a statutory probate court is concurrent with that of a district court, any cause of action appertaining to estates or incident to an estate shall be brought in a statutory probate court rather than in the district court." Tex. Prob.Code Ann. § 5A(b) (Vernon 1980). Pierce contends that this provision means that Vickie's counterclaim could not have been asserted in a Texas district court because, in Pierce's view, the counterclaim is a matter "appertaining to" or "incident to an estate."

The Texas Probate Code defines "appertaining to estates" and "incident to an estate" to include:

[T]he probate of wills, the issuance of letters testamentary and of administration, and the determination of heirship, and also ... all claims by or against an estate, all actions for trial of title to land and for the enforcement of liens thereon, all actions for trial of the right of property, all actions to construe wills, the interpretation and administration of testamentary trusts and the applying of constructive trusts, and generally all matters relating to the settlement, partition, and distribution of estates of deceased persons.

Tex. Prob.Code Ann. § 5A(b) (Vernon 1980). It is uncontested that Vickie's counterclaim does not fall into any of these specific categories except possibly the last,

---

**13.** Texas state district courts are of course separate and distinct from the United States District Courts in Texas. Throughout this section of this order, "district court" refers to a Texas state court of general jurisdiction, not a federal court.

"generally all matters relating to the settlement, partition, and distribution of estates of deceased persons." However; this is not an exclusive list, and thus even a matter not falling within one of the specifically enumerated categories could nonetheless be appertaining or incident to an estate.

However, Texas case law confirms that Vickie's counterclaim, under Texas law, is not appertaining or incident to J. Howard, Sr.'s estate. Texas courts hold that "[a]n action is 'incident or appertaining' to an estate when the outcome will have a direct bearing on the assimilation, collection, and distribution of the decedent's estate." *Falderbaum v. Lowe*, 964 S.W.2d 744, 747 (Tex.App.1998); *see also Crawford v. Williams*, 797 S.W.2d 184, 185 (Tex.App. 1990) ("Matters incident to an estate includes those matters in which the controlling issue is the settlement, partition, or distribution of an estate."). Here, Vickie's counterclaim is asserted against Pierce individually and makes no claim against the estate or even against the trusts existing at the time of J. Howard, Sr.'s death. In fact, Vickie's counterclaim is at least in part premised on the theory that she is entitled to nothing either from the living trusts or from the estate itself. Her theory is that Pierce prevented J. Howard, Sr. from including her in the living trusts. Thus, it is entirely possible that the trusts, as currently structured, are legally valid but also that Pierce owes Vickie damages for preventing J. Howard, Sr. from structuring the trusts in another way.

The Texas cases cited by Pierce are inapposite because they concern claims regarding an estate itself, rather than against a person individually for actions taken prior to the decedent's death. *E.g., Bailey v. Cherokee County Appraisal Dist.*, 862 S.W.2d 581, 585 (Tex.1993) (holding that taxes accruing on estate property after death are a claim against the estate and that a suit to collect them is therefore "incident to an estate"); *Perfect Union Lodge No. 10 v. Interfirst Bank of San Antonio*, 748 S.W.2d 218, 221 (Tex. 1988) (holding that the interpretation of a testamentary trust is "incident to an estate"); *In the Matter of the Estate of McGarr*, 10 S.W.3d 373, 379 (Tex.App. 1999) (holding that an action seeking an inventory, accounting, and distribution of an estate was "appertaining to an estate"); *Crawford*, 797 S.W.2d at 185–86 (holding that an action for turnover of estate property, an accounting, a declaration that a will was void for undue influence, and distribution as if the decedent had died intestate had to be brought in the probate court); *Boman v. Howell*, 618 S.W.2d 913, 915–16 (Tex.Civ.App.1981) (holding that a suit seeking declaratory judgment regarding the construction of a will had to be brought in the probate court); *Thomas v. Tollon*, 609 S.W.2d 859, 860 (Tex.Civ.App. 1980) (holding that a suit seeking division of an estate was "incident to an estate").

These cases nicely set forth the rule that claims for matters incident to an estate should be brought in the probate proceeding, but they do not address the underlying question of whether Vickie's counterclaim constitutes a matter "incident to an estate." Pierce assumes this to be true without providing authority or argument in support of his position.

Other cases demonstrate that Vickie's counterclaim is not "incident to an estate." In *Sobel v. Taylor*, 640 S.W.2d 704, 706 (Tex.App.1982), one child of a decedent sued his two siblings, also children of the decedent, for alleged misdeeds both as co-trustees of the decedent's trust before his death and as co-executors after the decedent's death. The allegations were similar to those Vickie has made against Pierce: mismanagement of the trust, fraud, and

self-dealing. *Id.* The Court of Appeals of Texas held that the suit was not "incident to an estate," and therefore could proceed independently in the district court, rather than the probate court, because the alleged actions occurred prior to the decedent's death and because the damages sought were from the co-trustees and co-executors in their individual capacities, rather than a distribution from the trust itself or the decedent's estate. *Id.* at 707. The same is true of Vickie's counterclaim.

Similarly, in *Jansen v. Fitzpatrick,* 14 S.W.3d 426, 434 (Tex.App.2000), the court held that the district court had jurisdiction over claims more directly related to a probate proceeding than is Vickie's counterclaim. The decedent in *Jansen* had prepared a will naming certain individuals as residuary beneficiaries who, under the will, would receive shares in certain real property owned by the decedent. *Id.* at 429. Subsequent to the preparation of this will and two months before her death, the decedent gave the real property to her niece. *Id.* After the decedent's death, the residuary beneficiaries sued the niece in district court, seeking to have the deathbed conveyance set aside on the grounds that the decedent was incompetent at the time she made the conveyance and under the undue influence of the niece. *Id.* at 430. The district court's jurisdiction was upheld by the court of appeals, although it was challenged on grounds other than those at issue here. *Id.* at 432–33.

Pierce attempts to distinguish *Sobel* and *Jansen* on the grounds that those suits were against executors and a specific provision of the Texas Probate Code provides for concurrent jurisdiction over actions against executors. *See* Tex. Prob.Code Ann. § 5(d) (Vernon 1980). However, neither the *Sobel* nor *Jansen* court relied on this provision in analyzing whether the claims at issue were "incident to an es-tate." Further, the statutory provision cited by Pierce also provides for concurrent jurisdiction over actions "involving an *inter vivos* trust," and under Pierce's characterization of Vickie's counterclaim, which differs from the Court's, her claim would fall within this provision.

Pierce also argues that Texas's "dominant jurisdiction" theory, under which the first court to assert jurisdiction over a matter exercises that jurisdiction to the exclusion of all other courts, means that once the Texas probate proceeding was pending, no Texas district court could have heard Vickie's counterclaim. However, this rule is subordinate to the test for whether an action is appertaining or incident to an estate. Thus, if an action is appertaining or incident to an estate and a probate proceeding is pending, under the doctrine of dominant jurisdiction no other court can exercise jurisdiction over matters appertaining or incident to the estate. However, other courts may exercise jurisdiction over matters that are not incident to the estate. *See Falderbaum,* 964 S.W.2d at 747 (holding that a district court "was not required to abate" an action brought under concurrent probate and district court jurisdiction because the action was not incident to the estate). Here, under the authority of *Sobel,* Vickie's counterclaim is not incident to J. Howard, Sr.'s estate, and hence the dominant jurisdiction doctrine does not apply to it.

Finally, Pierce also notes that under Texas law, a probate court may in some settings have the power to draw in an action pending in a district court on a transfer. Tex. Prob.Code Ann. § 5B (Vernon 1980). However, this provision is irrelevant both because such a transfer can be done only for matters incident to an estate and because that power does not negate the fact that if, for whatever reason, the probate court does not transfer in

the action, the district court may continue to exercise jurisdiction over it.

Because, under Texas law, Vickie's counterclaim for tortious interference does not fall within the exclusive jurisdiction of a probate court, it does not fall within the probate exception to federal jurisdiction. Therefore, both the bankruptcy court and this Court have valid subject matter jurisdiction over this counterclaim.[14]

## B. Core Versus Non–Core Distinction

■■■■ Bankruptcy courts may exercise plenary powers only over "core" bankruptcy matters. Over matters that are not core, bankruptcy courts may not enter final judgment, but may only issue proposed findings of fact and conclusions of law. These are reviewed *de novo* by the district court, which then enters final judgment. The bankruptcy court determined that Vickie's counterclaim is a core matter. Pierce disputes this determination.[15]

■■■■ As in the preceding discussion of jurisdiction, the Court rejects Vickie's suggestion that merely by filing a proof of claim, Pierce subjected himself to the bankruptcy court for all purposes. This

theory does not appear to be to the current state of the law. First, the nature of Pierce's claim against Vickie must be analyzed separately from Vickie's counterclaim against Pierce. Otherwise, the body of law that has developed for analyzing counterclaims would be superfluous. Second, whether or not a certain proceeding is core or non-core is a legal question dependant on the issues raised and the procedural posture of the proceeding; a proceeding cannot be transformed from being non-core to being core through consent or waiver. It would go against *Marathon* to hold that by filing a proof of claim, a creditor consents or waives any objections to core treatment.[16] Consent is relevant to the discussion only in that a party may consent to the bankruptcy court issuing final judgment in a non-core matter, thereby rendering any distinction between whether that proceeding is core or non-core meaningless. However, such consent must be express, not implied. Fed. R. Bankr. P. 7012(b). While he failed either to admit or deny that Vickie's counterclaims are core in his answer, Pierce has never expressly consented to the bankruptcy court entering final judgment.[17]

---

14. Similarly, but considering Florida rather than Texas law, another federal court held that the probate exception did not bar federal courts from exercising jurisdiction over a claim for tortious interference with the expectation of an inheritance or gift when the plaintiffs alleged that the defendants "systemically and fraudulently acted to influence one Arthur Welch to revoke a last will and testament in which he had named the [plaintiffs] as substantial beneficiaries and to execute instead a will for the benefit of [defendants]." *DeWitt v. Duce*, 599 F.2d 676, 677 (5th Cir. 1979).

15. If Pierce is correct, this Court will exercise *de novo* review over the other aspects of the bankruptcy court's decision, which are not addressed in this order. If the bankruptcy court and Vickie are correct, this Court will

review the other aspects of the bankruptcy court's decision for abuse of discretion.

16. Vickie argues that *Langenkamp v. Culp*, 498 U.S. 42, 44, 111 S.Ct. 330, 331, 112 L.Ed.2d 343 (1990) supports her position. In that case, decided after *Marathon*, the Supreme Court held that after a creditor files a proof of claim, a preferential transfer action asserted in response by the debtor becomes a part of the allowance or disallowance of that claim and there therefore is no right to a jury trial. However, the Court framed the issue in terms of the nature of the claims, not consent. *Id.*

17. Pierce's attorney once stated at a hearing in the bankruptcy court that Pierce would be "happy" and "pleased" to litigate in the bankruptcy court. Pierce's Appendix at 190–95. The most logical interpretation of these state-

■ Initially, Pierce argues that 28 U.S.C. § 157(b), which identifies certain types of proceedings as core, is not "jurisdictional." The word "jurisdiction," which is used in different ways in different contexts, has three relevant meanings or applications in the bankruptcy context. First, a characteristic that would deprive all federal courts of subject matter jurisdiction, such as the probate exception, deprives bankruptcy courts of subject matter jurisdiction. Second, bankruptcy courts, as adjuncts to the district courts, may only exercise "jurisdiction" over the matters given to them by statute. *See* 28 U.S.C. § 1334. Jurisdiction in this second sense of the word is quite broad, covering all core matters and all non-core, "related" matters, but some matters may involve the debtor or the bankruptcy proceeding so tangentially that they are not even "related to" the bankruptcy case. Third, in so far as the word "jurisdiction" is used to mean the bankruptcy court's power to enter a final judgment, the bankruptcy court does not have "jurisdiction" to enter final judgments in non-core matters. However, while a bankruptcy court may not enter final judgment in a non-core matter, it may certainly exercise "jurisdiction" over the matter in the sense of hearing and presiding over the matter up to the point when it presents proposed findings of fact and conclusions of law to the district court.

■ Thus, Pierce's argument that § 157(b) is not "jurisdictional" is true in a certain sense but is somewhat beside the point. Section 157 governs the determination of whether a matter is core or non-core. The bankruptcy court has jurisdiction over both core and non-core matters. Having determined that Vickie's counterclaim does not fall within the probate exception to federal subject matter jurisdiction, the Court has disposed of all "jurisdictional" objections to this case. This is so because, at the least, Vickie's counterclaim is "related to" Vickie's bankruptcy case. "Related to" jurisdiction is very broad, covering any matter that "conceivably" could have an impact on the estate or the administration of it. *In the Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987). Vickie's counterclaim could have an impact on the estate as it could greatly increase the size of the estate.

However, for the reasons that follow, while it is a "related" matter, Vickie's counterclaim is not a core bankruptcy proceeding.

■ Any discussion of the distinction between core and non-core matters must start with the Supreme Court's decision in *Marathon*. In this case, the Supreme Court considered the constitutionality of the Bankruptcy Act of 1978, the precursor to the modern bankruptcy code. A plurality of the Court held that it was unconstitutional to vest full and final authority over any matter conceivably related to a bankruptcy case in non-Article III judges, because under the Constitution, the "judicial power" of the United States, if vested in lower federal courts at all, must be vested in courts with Article III safeguards. *Marathon*, 458 U.S. at 84–87, 102 S.Ct. at 2878–80. Because of its Article I power to determine the substantive components of bankruptcy law, Congress may provide that bankruptcy judges can exercise full authority over those bankruptcy proceedings that are so closely related to substantive bankruptcy law and procedures that they can be said to be "core" bankruptcy matters. *Id.* However, Congress may not, through statutory enactments, give Article I bankruptcy

ments, in the context in which they were made, is that he was referring only to litigation of Pierce's claim and the dischargeability determination, not to Vickie's counterclaim.

judges the power to render final judgments over matters that are not directly connected to the bankruptcy code. *Id.*

■■■ The modern bankruptcy code's distinction between core and non-core "related" matters is a direct response to the constitutional concerns addressed in *Marathon.* Specifically, the code provides:

> Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 ... and may enter appropriate orders and judgments, subject to [appellate] review under section 158 of this title.

28 U.S.C. § 157(b)(1). Thus, Congress defined "core" matters as "cases under title 11" and "core proceedings arising under title 11[ ] or ... in a case under title 11." *Id.* The legislative history indicates that through this definition, Congress intended for bankruptcy judges to exercise final authority over as many matters as constitutionally possible.

■■■ Proceedings "arising under" title 11 are those substantive claims for relief that are based on rights expressly granted by title 11, the bankruptcy code. *In the Matter of Wood,* 825 F.2d at 96. This provision functions analogously to 28 U.S.C. § 1331, which grants federal courts jurisdiction over claims "arising under" the Constitution or laws of the United States. *Id.; see also* 1 Lawrence P. King, *Collier on Bankruptcy* ¶ 3.01[4][c][i] (15th ed.2000). Proceedings "arising in" a case under title 11 are procedural actions that could only happen in a bankruptcy case. The Fifth Circuit has explained:

> The meaning of "arising in" proceedings is less clear, but seems to be a reference to those "administrative" matters that arise *only* in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by title 11, but never-

theless, would have no existence outside of the bankruptcy.

*In the Matter of Wood,* 825 F.2d at 97; *see also Collier, supra* ¶ 3.01[4][c][iv] (referring to actions "arising in" as a "residual category").

■■■ Both "arising under" and "arising in" proceedings can be distinguished from proceedings that are only "related to" the bankruptcy case. "Related to" proceedings are substantive claims for relief based upon non-bankruptcy law that could have been the subject of an independent lawsuit absent the filing of a bankruptcy case. *Collier, supra* ¶ 3.01[4][c][iv]. In general, the distinction is stated as follows: if a cause of action is not dependant on the bankruptcy code for its existence, but could have been asserted as an independent lawsuit absent the filing of a bankruptcy case, it is a non-core, related matter. *In the Matter of Wood,* 825 F.2d at 96–97. This distinction stems from the constitutional requirements set forth in *Marathon.*

■■■ Considering these general definitions of "core" and "arising under" and "arising in," Vickie's counterclaim appears to be non-core. Substantively, the counterclaim is based entirely on state law. If she had not filed for bankruptcy, she could have asserted the counterclaim in an independent lawsuit against Pierce. Her counterclaim is not based on a right granted by bankruptcy law.

The analysis cannot end here, however. Many of the claims that are litigated in a bankruptcy case could have been separate lawsuits if no bankruptcy petition had ever been filed. This alone does not render the claims non-core, because such a result would eviscerate most of bankruptcy law itself. As stated by Representative Kastenmeier in the legislative history:

State law rights arising in core bankruptcy proceedings are functionally equivalent to congressionally created rights, because Congress has the power to modify State law rights in bankruptcy proceedings. Unlike the States, Congress may impair the obligations of contracts through the bankruptcy clause. Indeed, the very purpose of bankruptcy is to modify the rights of debtors and creditors, and the bankruptcy code authorizes the bankruptcy court to abrogate or modify State-created obligations in many ways.

130 Cong. Rec. H1110 (daily ed. Mar. 20, 1987) (quoted in *Collier, supra* ¶ 3.02[2] ). Thus, in determining whether a claim is core or non-core, courts must consider both the substantive nature of the claim and the procedural posture whereby it is asserted. For example, the filing of a proof of claim creates a bankruptcy core proceeding even though the underlying state law claim would not have been. *In re Bellucci,* 119 B.R. 763 (Bankr.E.D.Cal. 1990).

In making this analysis of both the substantive and procedural aspects of the proceedings at issue, courts look to 28 U.S.C. § 157(b)(2), in which Congress set forth a list of specific matters it viewed as core.[18] The only provision of § 157(b)(2) that is relevant to Vickie's counterclaim is § 157(b)(2)(C), which states that "counterclaims by the [debtor's] estate against persons filing claims against the [debtor's] estate" are core proceedings.[19] Counterclaims can be core under this definition

when they "arise in" a bankruptcy case. The bankruptcy court held that because of this provision, Vickie's counterclaim is core.

On first impression, the bankruptcy court's decision appears correct. First, the Court agrees with the bankruptcy court that Vickie's counterclaims are not rendered outside the scope of § 157(b)(2)(C) solely because they were brought against Pierce's adversary complaint, rather than against his actual proof of claim. The Pierce adversary proceeding began with an adversary complaint filed by Pierce seeking a determination of dischargeability and a proof of claim, which stated that the amount of his damages was "unliquidated" and to which was attached a copy of his nondischargeability adversary complaint. Vickie answered the complaint and filed counterclaims against it, and she objected to the proof of claim. Numerous courts have found claims asserted by the debtor against a person who has filed proofs of claims against the estate to be counterclaims within the meaning of this section, and therefore core proceedings, even though the claims were asserted by procedures other than counterclaiming against the proof of claim itself. *See, e.g., In re Carrington Gardens Assocs.,* 248 B.R. 752, 766–67 (Bankr.E.D.Va.2000) (holding that a creditor had "waived its right to limit or bar the bankruptcy court from hearing counterclaims to" its proof of claim against the debtor because, "[b]y filing its proof of claim," it "in essence

---

**18.** Proceedings not specifically listed in the statute may still be considered core. The statute itself has a "catch-all" provision, and also it states that core proceedings "include" those specifically enumerated. 28 U.S.C. § 157(b)(2).

**19.** Vickie also argues that her counterclaim is core as a turnover proceeding under 28 U.S.C. § 157(b)(2)(E). However, the counter-

claim ruled on by the bankruptcy court addressed whether Pierce owes Vickie damages in an individual capacity and did not address, for example, turnover of community property already belonging to Vickie. Therefore, the counterclaim cannot be characterized as a turnover proceeding and cannot receive core treatment on that grounds. *In re Kincaid,* 917 F.2d 1162, 1165 (9th Cir.1990).

converted [the debtor's] adversary proceeding ... [to] a counter claim").[20]

Second, the Court rejects Pierce's argument that he sought only a determination of dischargeability and did not actually make a claim against Vickie's estate. It is true that a nondischargeability complaint does not automatically include or subsume the underlying claim but is instead a separate, theoretically distinct claim. *In re Thrall,* 196 B.R. 959, 967–68 (Bankr. D.Colo.1996). However, here Pierce filed a proof of claim in addition to his nondischargeability complaint. On that proof of claim, he stated that he had a claim for an "unliquidated" amount. He nonsuited Vickie from his then-pending state court defamation action, and he never sought relief from the automatic stay. As his counsel explained at a hearing in the bankruptcy court on a motion brought by Pierce to dismiss or stay Vickie's counterclaims, Pierce "took" his substantive defamation claim and "put" it into the form of the nondischargeability adversary complaint:

> A lawsuit for libel or slander was filed pre-petition in Dallas County. The Debtor filed bankruptcy in January. And that matter was stayed. The trial counsel nonsuited the Debtor. We took the claims against the Debtor that were set forth in the ... slander action, put them into a nondischargeability complaint—.... So the allegations that formed the state court petition for libel and slander, as they related to the Debt-

or, were then taken and put into the nondischargeability complaint, which we filed here in this Court. Now, it was filed as a nondischargeability complaint because we believe that there's evidence to demonstrate [that Vickie acted willfully and maliciously]. So, under 523, it was like a dischargeability complaint and it was filed here.

Vickie's Appendix, Tab 7, at 4:8–14; 6:14–7:1. Later in the same hearing, Pierce's counsel stated that he "has assumed ... that if the Court was going to stay the counterclaims, you would have stayed the entire adversary proceeding, *which included the slander lawsuit* that was filed under 523.... [W]e'd be happy to stay *both halves* of the action...." *Id.* at 20:17–25 (emphasis added). Thus, given that he filed a proof of claim in addition to his nondischargeability adversary complaint, and given that he never tried to continue to pursue the substantive aspect of his defamation claim against Vickie elsewhere, Pierce cannot now argue that he never made a claim against her estate.

Thus, Vickie's counterclaim for tortious interference falls within the literal language of § 157(b)(2)(C). However, most courts agree that the plain language of § 157(b)(2)(C) cannot be the end of the analysis, because such a construction would conflict with *Marathon.* In the statute, Congress set forth its view as to what matters fall within the constitutional parameters, but in interpreting the stat-

---

**20.** For similar cases, see *In re Performance Nutrition, Inc.,* 239 B.R. 93, 99 (Bankr. N.D.Tex.1999) (holding that claims in a bankruptcy trustee's adversary complaint against two persons who had filed proofs of claims against the estate were counterclaims); *Allen v. City Finance Co.,* 224 B.R. 347, 352 (S.D.Miss.1998) (holding that claims asserted in a complaint filed by the debtor against a creditor who had filed proofs of claim "were, in essence," counterclaims against the creditor); *see also Pan American World Airways, Inc. v. Evergreen Intern. Airlines, Inc.,* 132 B.R. 4, 7 (S.D.N.Y.1991) (holding that claims in a complaint initiated by the debtor against an entity that had not yet filed a proof of claim in the bankruptcy proceeding, but intended to do so, were counterclaims within the meaning of § 157(b)(2)(C)).

ute, courts must consider not just the literal language of the statute, but the constitutional concerns behind it. *In re Castlerock Properties*, 781 F.2d 159, 162 (9th Cir.1986). Specifically as to § 157(b)(2)(c), footnote 31 of the plurality opinion in *Marathon* suggests that it would be unconstitutional to hold that any and all counterclaims are core and therefore can be finally determined by a bankruptcy judge. *Marathon*, 458 U.S. at 79 n. 31, 102 S.Ct. at 2876 n. 31.

Thus, on the one hand, calling any counterclaim that falls within the literal language of the statute core seems to contradict the holding of *Marathon*. On the other hand, calling any counterclaim that could have been asserted as an independent lawsuit non-core seems to render § 157(b)(2)(c) itself nugatory, because any counterclaim could have been asserted as a separate lawsuit absent the filing of the bankruptcy petition. *Collier* notes this problem and states that "[t]he matter is still unsettled." *Collier, supra* ¶ 3.02[3][d][i].

It appears that the justification for core treatment for counterclaims is a combination of judicial economy and efficiency for the litigants, in addition to recognition of the fact that practically, adjudication of a counterclaim that is closely related to a claim will almost merge into allowance or disallowance of the claim itself. *In re Castlerock*, 781 F.2d at 162.[21] Keeping these concerns in mind, courts have developed various doctrines for limiting the

reach of § 157(b)(2)(C). For example, courts are loath to call counterclaims core when they are filed against a proof of claim that was filed "defensively" by a creditor who has already tried to have its claim determined by a court other than the bankruptcy court. *In re Castlerock*, 781 F.2d at 162. This exception does not apply in this case, because Pierce filed his proof of claim offensively.

In addition, counterclaims that are permissive, rather than compulsory, do not receive core treatment. A compulsory counterclaim is one that arises out of the same factual transaction as the claim against which it is asserted. Fed.R.Civ.P. 13(a). The bankruptcy court held that Vickie's counterclaim arises out of the same transaction as Pierce's defamation claim. Pierce alleged that Vickie had acted willfully and maliciously by defaming him when her attorneys, at her direction, told members of the press that Pierce used forgery, fraud, and overreaching to gain control of J. Howard, Sr.'s estate. Libel and defamation claims are nondischargeable under § 523(a)(6) when the statements were made with actual knowledge of their falsity. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986). Thus, at issue, in addition to whether Vickie was responsible for the statements of her attorneys, is whether she knew the statements to be true or false. The bankruptcy court held that proving the truth or falsity of the statements requires proof of some of the same facts as are at issue on Vickie's counterclaim. *Cf. Albright v. Gates*, 362

---

**21.** The Ninth Circuit issued its opinion in *In re Castlerock* soon after the modern bankruptcy code was enacted. In this passage, it also states that "well-settled law" holds "that a creditor consents to jurisdiction over related counterclaims by filing a proof of claim." *In re Castlerock*, 781 F.2d at 162. However, the law it cites in support of this proposition is all

pre-*Marathon*, and the court did not specifically consider the impact of *Marathon* on the prior practice of jurisdiction by consent. As indicated, this does not appear to be the law post-*Marathon*. However, the policy reason for the rule could still be the animating force behind § 157(b)(2)(C).

F.2d 928, 929 (9th Cir.1966) (holding that a counterclaim for recovery of the price paid for oil rights was a compulsory counterclaim to a claim for slander consisting of stating the oil rights were worthless).

However, this nexus between the transactions out of which the claim and counterclaim arise at issue is somewhat attenuated.[22] Pierce had already obtained a judgment against Vickie's attorneys prior to the time when his claim against Vickie was ruled on by the bankruptcy court. The main issue presented by Pierce's claim is Vickie's responsibility for the statements of her attorneys, not the statements' truth or falsity. Thus, the primary facts at issue on Pierce's claim were the relationship between Vickie and her attorneys and her knowledge or approval of their statements. *See generally In re Durso Supermarkets, Inc.*, 170 B.R. 211, 214 (S.D.N.Y.1994) (holding that when a proof of claim is filed based on a state court judgment, the judgment itself is a different factual transaction from the fact underlying it and thus a counterclaim arising out of the same facts as the underlying action was not core, thereby suggesting that the factual transaction test need not be applied reflexively in all circumstances).

Thus, it is not certain that Vickie's counterclaim arises from the same transaction as Pierce's proof of claim. Further, considering both the general rule behind the core classification, which stems from the constitutional concerns of *Marathon,* and also the specific policy that underlies § 157(b)(2)(C), the Court concludes that the counterclaim is not core.

As indicated, absent Pierce's filing of a proof of claim regarding the alleged defamation, the counterclaim clearly would be only a non-core, related matter. In this case, the reasons for why counterclaims arising out of the same transaction should usually be considered core do not apply. Counterclaims can be core in essence because of judicial economy and what, as a practical matter, makes good sense for the litigants. The purpose of the rule is to prevent a debtor or trustee from having to split a cause of action by defending against a proof of claim in the bankruptcy proceeding but being unable to assert counterclaims there, instead being forced to pursue counterclaims in a different proceeding or forum. *In re Castlerock,* 781 F.2d at 162. Treating Vickie's counterclaim as core is not necessary to advance these policies in this case.

Here, Vickie's counterclaim dwarfs Pierce's defamation in all respects, both in terms of the time and effort spent litigating it and the size of the potential judgment. On Vickie's motion, the bankruptcy court granted summary judgment to Vickie on Pierce's adversary complaint, holding that Vickie was not responsible for any statements made by her attorneys. The counterclaim proceeded to trial and has been pending for over two years since then

---

22. Pierce also argues that even if it arises from the same transaction, Vickie's counterclaim is not compulsory because otherwise-compulsory counterclaims need not be stated if they are the subject of another pending action, and Vickie's counterclaim originally was at issue in the Texas probate proceeding. However, while the party asserting a counterclaim may decline to do so if the counterclaim is the subject of another proceeding, the party is not required to do so. 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1411, at 87 (3d ed. 1998) ("If defendant elects to interpose the pending claim as a counterclaim, however, he should be allowed to do so, and the counterclaim will be treated as if it were compulsory.").

on its own. The bankruptcy court confirmed Vickie's plan of reorganization on March 8, 1999, over six months before the counterclaim went to trial. While arguably the defamation and tortious interference claims arise out of the same factual transaction, this connection is attenuated. Further, the counterclaim raises issues of law entirely different from those raise on the defamation claim.[23]

In *In re Kamine/Besicorp Allegany, L.P.*, 214 B.R. 953, 968–71 (Bankr.D.N.J. 1997), the court held that counterclaims asserted by the debtor against a creditor that had filed a proof of claim were not core, notwithstanding the fact that they arose from the same transaction as the proof of claim. The debtor owned and operated a power plant. *Id.* at 955. Prepetition, a dispute arose between it and another entity involved in power production. After the debtor filed for bankruptcy, the other entity filed proofs of claim and then the debtor counterclaimed, asserting in part state common law contract claims. Discussing many of the same arguments advanced by Pierce and Vickie in this case, the court held that the counterclaim did not fall within § 157(b)(2)(C) and was not core because the filing of the proof of claim did not "initiate" or "create" the causes of action asserted in the counterclaim. *Id.* at 969. While procedural distinctions render *In re Kamine/Besicorp* not exactly analogous to the present case, this aspect of it is the same: Vickie's counterclaim was not "created" by Pierce's claim. Her dispute with Pierce runs much deeper and broader than his defamation claim and would exist even in the absence of his defamation claim.

In addition, while it does not give it much weight as the issue was not being directly argued, the Court notes that at a hearing in bankruptcy court on July 24, 1996, counsel for Vickie in fact stated that "we believe the counterclaims are related." Pierce's Appendix at 193:22.

■■■■■ Good arguments exist on both sides of this issue, and the Court acknowledges that reasonable jurists might differ in how they would decide it. Formally, Vickie's counterclaim falls within the language of § 157(b)(2)(C) and, barely, it falls within the "same transaction" rule courts have used when applying § 157(b)(2)(C). However, neither of those rules are ends in and of themselves. They serve only as means of amplifying and explicating the distinction drawn in *Marathon*. As the Ninth Circuit stated in *In re Castlerock*, "a court should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems. The apparent broad reading that can be given to § 157(b)(2) should be tempered by the *Marathon* decision." *In re Castlerock*, 781 F.2d at 162; *see also In re Thrall*, 196 B.R. at 968 ("A claim is not core simply because it falls within the wording of § 157(b)(2); the claim must also satisfy the mandate of [*Marathon* ]."). When a counterclaim is only somewhat related to the claim against which it is asserted, and when the unique characteristics and context of the counterclaim place it outside of the normal type of set-off or other counterclaims that customarily arise, thus rendering the efficiency concerns not at issue, the counterclaim should not be characterized as core.

---

**23.** Considering in particular that the policy underlying the counterclaim rule is that the debtor should not have to split a cause of action into two forums, the Court notes that

Vickie in fact voluntarily pursued similar or substantially similar claims in the Texas probate proceeding until after the bankruptcy court entered its final judgment.

## IV.

### CONCLUSION

The bankruptcy court's assertion of federal subject matter jurisdiction over Vickie's counterclaim for tortious interference is AFFIRMED. However, the bankruptcy court's determination that the counterclaim is a core proceeding is REVERSED. Because the counterclaim is a non-core proceeding, the bankruptcy court's judgment is VACATED.

The Court's decision means only that final judgment in this non-core proceeding must be entered by this Court rather than the bankruptcy court. By this order, the Court rules that the bankruptcy court's judgment is proposed rather than final, and therefore neither party has prevailed at the present time. Thus, Vickie's claim against Pierce for tortious interference has not yet been resolved by any court.[24] This Court will now engage in a comprehensive, complete, and independent review of the bankruptcy court's record and may, if warranted, hear additional testimony from the parties and witnesses. This review will enable this Court to decide whether J. Howard, Sr. promised a gift to Vickie, whether Pierce interfered with that gift, and also whether Pierce has destroyed and failed to produce relevant evidence in a way that justifies the imposition of sanctions.

As a consequence of this ruling, the current arrangements regarding security for a stay on execution of the judgment pending appeal are VACATED.

The Court sets a status conference in this matter for June 4, 2001 at 8:30 a.m. in Santa Ana. Prior to this conference, attorneys for the parties should meet and confer, in person, regarding the effect of this ruling on all matters pending between these and related parties. They shall file a joint status report regarding such issues no later than May 31, 2001 at 4:00 p.m.

Because this order involves two "controlling question[s] of law as to which there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), the Court hereby CERTIFIES this order for interlocutory appeal as to both the issue of the probate exception and the issue of whether Vickie's counterclaim is a core or non-core proceeding. Any appeal from this order shall not stay proceedings before this Court unless the Court of Appeals so orders.[25]

IT IS SO ORDERED.

---

24. Vickie's claim against Pierce individually was not addressed or determined by the Texas probate court.

25. The Court originally issued this order on May 24, 2001, without including any statement as to certification under 28 U.S.C. § 1292(b). Because a § 1292(b) certification must be in the order certified for appeal itself, the Court now issues this order in amended form including the requisite statement. *See* 28 U.S.C. § 1292(b) and Fed. R.App. P. 5(a)(3).